**Paschal L. AFCAN and Mary Afcan, Appellants,**

v.

**The MUTUAL FIRE, MARINE AND INLAND INSURANCE CO., Appellee.**

**No. 3174.**

Supreme Court of Alaska.

May 25, 1979.

**640**

Michelle V. Minor, Anchorage, for appellants.

Daniel A. Gerety of Delaney, Wiles, Moore, Hayes & Reitmann, Inc., Anchorage, for appellee.

## OPINION

Before BOOCHEVER, C. J., and RABINOWITZ, CONNOR and BURKE, JJ.

BURKE, Justice.

This appeal arises out of a third-party suit brought against an insurance company for breach of its contractual duty to defend its insured. The superior court granted the insurance company's motion for summary judgment. We find that the company failed to fulfill its contractual duty to defend. We therefore reverse the decision of the superior court and remand the case for entry of judgment in favor of appellants.

The events giving rise to this litigation began in 1971. At that time Robert Barclay owned a sole proprietorship in Fairbanks known as "Economic Services." In rendering these "services" Barclay acted primarily as an investment counselor, an insurance broker, and a real estate agent. In the fall of 1971 Mary Afcan contacted Barclay to inquire about obtaining some insurance. This initial contact eventually led to the establishment of a trust agreement between Barclay and Mr. and Mrs. Afcan. Pursuant to this agreement the Afcans, as trustors, transferred a number of stock certificates and municipal bonds to Barclay, as trustee to form the basis of the trust corpus.

The trust agreement, entitled "Investment Trust Agreement No. 20," was dated January 14, 1972. The relevant portions of that agreement state:

2. The Trustee shall hold, manage, invest and reinvest the trust corpus, increments thereto, and additions to said trust corpus hereafter made by the Trustors, if any, in such manner as the Trustee, his successors and assigns, shall deem appropriate and necessary to the profitable investment and management of this trust estate; provided, however, that such investments shall be limited to acquisitions of real estate and fractional interests therein, to real mortgages and deeds of trust (including such encumbrances of a subordinate nature), mutual funds, stocks and bonds (listed or over the counter securities), time and demand deposits.

3. The Trustee shall have the power to sell, transfer and convey, to lease, to lend (with security) and to mortgage, pledge or otherwise encumber, any portion of the trust estate, and generally to do all such acts as may be deemed necessary or expedient to the profitable investment and management of the trust estate.

.     .     .     .     .

5. The Trustee shall pay from the trust estate, all costs, expenses and disbursements to which the Trustee may be put by reason of the trust hereby created, including any federal, state or local taxes falling upon the trust, if such there shall be. The Trustee shall receive no compensation directly from this trust for his services, but shall be entitled to charge a reasonable consulting fee for his services, the same to be periodically billed to and directly paid by the Trustor. *In any sale of estate property, however, the Trustee may receive an agent's or broker's commission on the sale, payable out of sale proceeds, at a rate not to exceed that commonly charged in the Fairbanks, Alaska area, if he is otherwise licensed or qualified under pertinent laws to charge*

*the same, but shall be responsible for accounting to the Trustors therefor, and the same shall not result in a double commission being charged on the transaction.* [Emphasis added.]

This agreement was later supplemented by two other written agreements, dated February 8 and April 25, 1972, providing for the transfer of additional property to the trust corpus. Apart from these supplemental agreements, another trust agreement was entered into between the parties which established the Enep'ut Foundation, a charitable foundation whose purpose was "to devote and apply the property [of the trust] for educational purposes . . . ." This agreement, executed on March 1, 1972, provided that the trust corpus was to comprise the same property which was initially designated as the trust corpus of Investment Trust Agreement No. 20.

Between January 14, 1972, and May 19, 1972, Barclay purchased various parcels of real property in behalf of the trust. This property was acquired in his name as trustee.

Some months later, in August of 1972, Barclay contacted the Shand, Morahan Agency, underwriters for appellee Mutual Fire, Marine and Inland Insurance Company, to inquire about real estate agents' errors and omissions insurance. This contact eventually led to the issuance of a policy to Barclay which extended coverage up to one million dollars for any liability he might incur for breach of duty as an insurance agent, notary public or real estate agent. The policy, which was issued on September 20, 1972, stated in part:

I. *COVERAGE—ERRORS AND OMISSIONS INSURANCE:* To pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay by reason of liability for breach of duty as insurance brokers, insurance agents, surplus line agents, general insurance agents, notaries public or real estate agents, claim for which is made against them by reason of any negligent act, error or omission, whether committed or alleged to have been committed by the insured or any person employed by the insured, in the conduct of any business conducted by or on behalf of the insured in their capacity as insurance brokers, insurance agents, surplus line agents, general insurance agents, notaries public or real estate agents. The insurance afforded is only with respect to such coverages as are indicated by specific charge or charges on the declaration page hereof.

·    ·    ·    ·    ·

VI. *DEFENSE, SETTLEMENT, COOPERATION: The Company will defend any suit against the Insured seeking damages to which this insurance applies, even if any of the allegations of the suit are groundless, false, or fraudulent,* and it is agreed that the Company may make such investigation and settlement of any claim or suit as they deem expedient, but the Company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the Company's liability has been exhausted by payments of judgments or settlements. [Emphasis added.]

The policy also included an "Intentional Acts" endorsement which extended liability coverage to include claims arising from dishonest, fraudulent, or criminal or malicious conduct by an employee of the named insured. This coverage, however, was applicable only to claims against the insured based on conduct in his capacity as an "insurance agent broker." In addition, Barclay requested the deletion of the "Retroactive Exclusion Clause" to extend his coverage to include acts or omissions which occurred prior to the issuance of the policy. For this he paid an additional premium of $284.63 and warranted that there were no known claims or circumstances which might develop into claims. The clause was thereafter deleted from the policy on November 7, 1972.

On December 1, 1972, the Afcans commenced an action against Barclay alleging, in essence, that he had committed various willful and negligent acts in breach of his duties as trustee under their trust agreement. There was no specific reference in the complaint to any such acts committed

by Barclay in his capacity as real estate agent. Barclay took the complaint to an attorney in Fairbanks who advised him to send a copy to Mutual Fire. This was done, and shortly thereafter the New York firm representing Mutual Fire sent one of its attorneys, Ramon Held, to Fairbanks to look into the matter. On December 13, 1972, Held and Barclay entered into a "Non-Waiver Agreement" which stated in pertinent part:

> WHEREAS, a lawsuit has been instituted by [the Afcans] against Barclay in the Superior Court for the State of Alaska, Fourth Judicial District, No. 72–926, and
>
> WHEREAS, time is of the essence requiring a response to the aforementioned lawsuit by December 14, 1972, and
>
> WHEREAS, investigation conducted to date by MUTUAL FIRE indicates that there may be a coverage question in the aforementioned policy, Certificate Number C15100, as issued by MUTUAL FIRE to Barclay,
>
> IT IS NOW AGREED, between the parties undersigned that MUTUAL FIRE will afford a defense to Barclay in the outstanding lawsuit by AFCAN, subject to any additional information which MUTUAL FIRE may determine that there is no coverage under the policy aforementioned.
>
> In the event that MUTUAL FIRE determines that there is no coverage to Barclay under the policy as heretofore indicated, it specifically reserves the right to deny coverage and a continuing defense to Barclay upon reasonable notice.

Pursuant to this agreement Held contacted the law firm of Merdes, Schaible, Staley and DeLisio in Fairbanks and arranged for that firm to represent Barclay at the expense of Mutual Fire. Thereafter an attorney from that firm filed an answer to the complaint on behalf of Barclay, denying the allegations made against Barclay.

During the following nine months the case developed as the Afcans sought to have a court-appointed accountant review the records of the trust. In addition, they moved for a court-appointed receiver to take possession and custody of the assets of the trust.

On September 26, 1973, Held wrote to Barclay, informing him that pursuant to the terms of the "Non-Waiver Agreement" Mutual Fire was withdrawing from the defense of Barclay. The basis for this decision was Mutual Fire's conclusion, following an investigation, that Barclay's alleged liability was not within the coverage of the policy.[1] Held sent a copy of this letter to the law firm engaged by Mutual Fire to represent Barclay, instructing it to terminate the defense after allowing Barclay reasonable time to obtain his own counsel. The firm, however, continued to represent Barclay for some months thereafter, apparently because Barclay was not able to engage his own counsel. The case was subsequently transferred from Lyle Carlson to Howard Staley, another attorney in the same firm, when Carlson left to open his own law practice.

On December 13, 1973, Staley wrote to Held, stating in part:

> I am sure that after giving this matter some thought, you realize that getting out of this case is not nearly as simple as might be assumed from your letter [of Dec. 5, 1973]. We will of course follow your instructions and file a motion asking for leave of court to withdraw from the case, with the substitution of other counsel for Mr. Barclay. It is highly unlikely that the court would permit us to withdraw from the case until Mr. Barclay has

---

1. Held cited three grounds for concluding that the policy did not cover the alleged liabilty. First, the intentional acts alleged in the complaint were done in Barclay's capacity as a principal/owner of the insured business and therefore coverage was excluded by the terms of the "Intentional Acts Endorsement." Second, Barclay had knowledge of the Afcans' claim before the effective date of the policy and the policy explicitly excluded liability for events occurring before the effective date unless the insured had no knowledge of them. Third, Barclay's alleged liability was predicated on a violation of a statute and the policy specifically excluded coverage for such claims.

other counsel. If we simply cease doing anything in the case without leave of court, we would be subjecting not only ourselves, but the underwriters to most certain serious liability.

. . . . .

It appears to be a fordrawn [sic] conclusion that plaintiff probably will amend the complaint to state a cause of action under the policy. There is absolutely no question but that under Alaska law an insurer is obligated go defend not only against the cause or causes stated in the complaint, but against any causes of action which a reasonable investigation would disclose are likely to develop from the litigation whether such causes of action have been incorporated in the complaint or not. I would therefore suggest the underwriters would be playing completely into the hands of the plaintiff by abandoning the case at this juncture.

As predicted, an amended complaint was filed on December 18, 1973, which specifically alleged negligence on the part of Barclay acting in the capacity of a real estate agent. A copy of the amended complaint was sent to Held on January 9, 1974. Held responded on January 15, 1974, stating in part:

A review of the aforementioned documents in conjunction with the remainder of our file does not, in our opinion, warrant a change in our prior opinion and advice to Mr. Barclay that a defense herein on behalf of our principal and Underwriters interested will be terminated and in fact has.

Staley then sent a telegram to Held on January 20, 1974, which stated:

In view of your decision to abandon the defense of Robert Barclay, we will instruct Barclay that if he can escape personal liability by assigning his rights against his insurance carrier to the plaintiff, he should do so.

My analysis of the case indicates that Barclay has a serious personal exposure which is covered by the insurance policy of your client.

No further notice will be given you regarding my proposed settlement.

When it became clear to Staley that the insurance company was absolutely refusing to further provide for the defense of Barclay, he filed a motion in the superior court for leave to withdraw from the case. While the motion to withdraw was pending, however, Staley filed an answer to the amended complaint, denying the allegations contained therein. In addition, a counter-claim was filed against the Afcans, alleging that Barclay's business and reputation had been harmed by reason of the Afcans' actions in pursuing the litigation.

The motion to withdraw as counsel was granted on March 15, 1974. Barclay subsequently secured the services of another attorney, and that attorney was apparently instrumental in negotiating a final settlement between Barclay and the Afcans. In the settlement agreement, dated April 8, 1974, the Afcans released Barclay "from any and all claims, demands, actions, causes of action, known or unknown, including all property damage arising out of or in any way connected with or resulting from Barclay's service as Trustee under [Trust Agreement 20], or as a real estate agent." In return, Barclay agreed to execute a promissory note to the Afcans for $60,000. As a condition of the settlement, the Afcans covenanted "not to collect, sell, alienate, convey, assign, transfer, pledge or in any manner give a security interest" in the note, and they agreed not to sue or take judgment upon the note or execute on any judgment on the note if one were ever obtained. Furthermore, a "Hold Harmless" clause was added to the agreement, whereby the Afcans agreed

to indemnify, save harmless and defend Barclay from any loss, claim, expense, demand, liability or cause of action of any kind or character through the assertion of any person of any claim or claims on or connected with the $60,000.00 promissory note which underlies this settlement agreement . . . .

Finally, as part of the agreement Barclay assigned to the Afcans all his rights against Mutual Fire.

The Afcans subsequently filed suit against Mutual Fire for breach of duty to defend Barclay. Following extensive discovery, both sides filed cross-motions for summary judgment in the court below. After a hearing on the matter, the trial court issued a memorandum decision holding that Mutual Fire had a duty to proceed in the defense of Barclay at least to the point of establishing that the alleged liability of the insured was not in fact covered by the policy. Finding that Mutual Fire had fulfilled this duty, the court below ruled that there was no genuine issue as to any material fact and therefore granted summary judgment in favor of Mutual Fire. In addition, the court awarded attorney's fees to the insurance company as the prevailing party. The Afcans have appealed both decisions.

## I. THE DUTY TO DEFEND

It is Mutual Fire's contention that, although a complaint against an insured alleges a cause of action which, if proven, would give rise to liability covered by a professional liability insurance policy, the insurer is relieved of its duty to defend the insured when facts are uncovered which indicate that there would be no ultimate coverage under the policy. Mutual Fire relies in part on the decision of this court in *Continental Insurance Co. v. United States Fidelity & Guaranty Co.*, 528 P.2d 430 (Alaska 1974). There we held that "the insurer must defend a suit where the complaint alleges facts that may be within the policy coverage *or* where such facts are known or reasonably ascertainable by the insurer." *Id.* at 435 (footnotes omitted, emphasis added). We recognized that the existence of facts, "known or reasonably ascertainable," that might bring the claim within policy coverage established the duty of the insurance company to defend the insured against the claim. *Id.* at 434–35.[2]

Citing *Continental,* Mutual Fire contends that the pleadings are not determinative of the duty to defend and that regardless of the allegations in the complaint, if facts are discovered which show that there would be no coverage under the policy, an insurer may rightfully refuse to defend the insured. This position appears to have been adopted by the court below. In rendering summary judgment in favor of Mutual Fire, the trial court found that the cause of action against Barclay was in fact based on acts he committed as a trustee, despite an allegation in the complaint that Barclay had acted negligently as a real estate agent. Since the insurance policy only provided liability coverage for real estate agents' errors and omissions, the court held that there would be no liability under the policy and hence no duty to defend. For the reasons stated below, we find that the trial court erred in its decision.

In *Theodore v. Zurich General Accident & Liability Insurance Co.*, 364 P.2d 51 (Alaska 1961), this court defined the scope of the duty arising under a standard duty to defend clause such as that contained in the policy issued to Barclay. In holding that the insurance company, Zurich, had a duty to defend, we stated in part:

> Zurich promised its insured to defend any suit "alleging" bodily injury or death under the employer's liability coverage in the policy, even if such suit were "groundless, false, or fraudulent." This language means that the obligation to defend exists when the injured party asserts a claim which, as a claim, is for a loss covered by the policy. *It is the allegation made in the complaint that controls.* If it comprehends an injury that may be within the policy, then the promise to defend includes it. The promise is not contingent upon the allegation being true. It may not be. But the burden of establishing this—in showing that the suit is "groundless"—is one which Zurich agreed to assume.

---

2. The "duty to defend" clause in *Continental* was substantively identical to the defense clause in issue in this case insofar as it required the insurer to "defend any suit against the insured alleging [a claim covered by the policy] and seeking damages on account thereof, even if such suit is groundless, false or fraudulent . . . ." 528 P.2d at 434, n. 11.

. . . [T]he whole point in this case, is that [the] complaint against [the insured] . . . alleges facts which, if proved, would have supported a recovery under that portion of the policy relating to [the insured's] liability. Under the unambiguous terms of the insurance agreement, Zurich then had the duty to proceed in the defense of the suit—at least to the point of establishing, if it could, that the liability upon which the plaintiff was relying was in fact not covered by the policy, and not merely that it might not be.

*Id.* at 55 (emphasis added, footnotes omitted).

Although in *Theodore* we indicated that an insurance company could properly terminate its defense of the insured if it could establish that "the liability upon which the plaintiff was relying was in fact not covered by the policy," we adopted a contrary position nine years later in *National Indemnity Co. v. Flesher*, 469 P.2d 360 (Alaska 1970). There we stated:

We believe that the rule of *Theodore* [that it is the allegation made in the complaint that controls] is sound and should be adhered to where the third party's allegations allege facts within policy coverage *despite the insurer's knowledge of facts disclosing a claim outside policy coverage.* In this situation *Theodore* comports with the reasonable expectations of the insured as to the defense that will be provided because it is clear that the insurer has promised to defend *any* suit alleging a claim within the coverage of the policy *even if such suit is "groundless, false, or fraudulent."*

*Id.* at 365 (emphasis added).

▇▇▇▇ We believe the position taken in *Flesher* is sound. An insurer's obligation to defend and the obligation to indemnify are separate and distinct contractual elements. *First Insurance Co. of Hawaii v. Continental Casualty Co.*, 466 F.2d 807, 811 (9th Cir. 1972); *Moffat v. Metropolitan Casualty Insurance Co. of New York*, 238 F.Supp. 165, 173 (M.D.Pa.1964); *Aetna Casualty & Surety Co. v. State Farm Mutual Automobile*

*Insurance Co.*, 16 Mich.App. 658, 168 N.W.2d 465, 466 (1969); *C. W. Davis Supply Co. v. Newark Insurance Co.*, 60 Misc.2d 946, 304 N.Y.S.2d 124, 127 (N.Y.Sup.Ct. 1969). *See generally* Annot., 50 A.L.R.2d 458, 475–80 (1956). Depending upon the nature of the claim against the insured, the insurer may have an obligation to defend although it has no ultimate liability under the policy. We believe that the language of the standard duty to defend clause creates a reasonable expectation on the part of the insured that he will be defended by the insurer *whenever* a complaint states a cause of action within, or potentially within, the policy coverage. The Mutual Fire policy provides: "The Company *will* defend *any* suit against the insured seeking damages to which this insurance applies, even if *any* of the allegations of the suit are groundless, false, or fraudulent." (Emphasis added.) Thus, even though facts extrinsic to the pleadings may show that there will be no ultimate liability under the policy, if the complaint *on its face* alleges facts which, standing alone, give rise to a possible finding of liability covered by the policy, the insured has the contractual right to a proper defense at the expense of the insurer. We hold, therefore, that when a complaint is sufficient on its face to create an issue of liability covered by the policy, even though based on "false, fraudulent, or groundless" allegations, an insurer may not look to extrinsic facts to escape its duty to defend the insured. *See Patterson v. American Mutual Liability Insurance Co.*, 304 F.Supp. 1088, 1090 (D.Conn.1969); *Missionaries of Company of Mary, Inc. v. Aetna Casualty & Surety Co.*, 155 Conn. 104, 230 A.2d 21, 25 (1967). *See also* Annot., 50 A.L.R.2d 458, 497–511 (1956).

This holding does not conflict with our decision in *National Indemnity Co. v. Flesher*, 469 P.2d 360 (Alaska 1970), because the rule we are applying in this case—that the pleadings control—applies only in those instances where the complaint alleges a claim *within* the coverage of the policy. In *Flesher* we held that the pleadings are *not* controlling where the complaint alleges a claim

*not* within the policy: "[W]e hold that an insurer must defend when the suit alleges facts within an exception to the policy but the true facts are within, or potentially within, the policy coverage and are known or reasonably ascertainable to the insurer." 469 P.2d at 366. We believe there is a significant distinction between the two situations—(1) where the complaint states a claim *within* the policy but the facts indicate there is no coverage, and (2) where the complaint states a claim *outside* the policy but the facts indicate the claim is actually covered. *See* Annot., 50 A.L.R.2d 458, 497 n.15 (1956).[3]

■■ In this case an amended complaint was filed by the original plaintiff against the insured which specifically alleged that Barclay had acted negligently as a real estate agent. Specific allegations which create a coverage issue are sufficient to invoke a duty to defend even though alleged for the first time in an amended complaint. *See Alm v. Hartford Fire Insurance Co.*, 369 P.2d 216, 218–20 (Wyo. 1962). Here the insurer was fully apprised of the filing and contents of the amended complaint and yet steadfastly refused to defend. This constituted a breach of Mutual Fire's contractual duty to defend Barclay.[4] The court below therefore erred in granting summary judgment and attorney's fees to Mutual Fire, and its decision is reversed and remanded with instructions to enter judgment in favor of the Afcans.

## II. CONSEQUENCES OF THE WRONGFUL FAILURE TO DEFEND

■ When an insurer breaches the insurance contract by wrongfully refusing to defend its insured, the insurer will always be liable for the reasonable costs and attorney's fees subsequently incurred by the insured in the defense of the claim. *Marwell Construction, Inc. v. Underwriters at Lloyd's London*, 465 P.2d 298, 307 (Alaska 1970). *See also* Annot., 49 A.L.R.2d 694, 721–36 (1956). The insurer will also be liable for attorney's fees incurred by the insured in settling the claim. 7A J. Appleman, Insurance Law and Practice § 4691, at 505 (1962) & at 355 (Cum.Supp.1974).

In *Theodore v. Zurich General Accident & Liability Insurance Co.*, 364 P.2d 51 (Alaska 1961), we held that, where an insurance company wrongfully refused to defend, it was liable for the full amount of the settlement reached by the insured.[5] We held that, in a subsequent suit on the policy, the company had no right to claim that the liability was not covered by the policy. This holding, however, has been limited somewhat by our decision in *Marwell Construction Co. v. Underwriters at Lloyd's, London*, 465 P.2d 298 (Alaska 1970). In *Marwell* we recognized the right of the insurance company under certain circumstances to contest coverage in a subsequent action on the policy:

> Even when the parties to a present action are identical to the parties to an earlier action, the decree in the earlier action will not be binding if the decree could have been rendered on two or more grounds but there is nothing in fact or in the record to show which ground was the basis of the decree.

**3.** Professor Keeton has also recognized this distinction:

> [A]s an *inclusionary* test, this standard (the nature of the claim against the insured) is . . . consistent with the weight of authority. Quite clearly, however, it is not reliable as an *exclusionary* standard. That is, it cannot be relied upon as the basis for answering a number of questions that may be raised by an insurer's contention that it has no duty to defend because the victim alleges only a claim against the insured that falls outside the scope of the insuring agreements.
>
> R. Keeton, Basic Text on Insurance Law § 7.6(a) at 464 (1971).

**4.** The existence of the "Non-Waiver Agreement" in no way alters this conclusion. Once the amended complaint was filed Mutual Fire had an affirmative duty to defend Barclay under the terms of the original contract. *See Kahla v. Travelers Ins. Co.*, 482 S.W.2d 928, 932–33 (Tex.Civ.App.1972).

**5.** Like the case at bar, *Theodore* involved a confession of judgment that was entered on the basis of a settlement agreement. 364 P.2d at 53.

*Id.* at 307–08. The position taken in *Marwell* was implicitly reiterated in *Continental Insurance Co. v. United States Fidelity & Guaranty Co.*, 528 P.2d 420 (Alaska 1974):

> The insurer who wrongfully fails to defend will . . . be precluded from relitigating any issues *necessarily determined* in the primary action, and will be required to indemnify at least to policy limits any liability imposed upon the insured in that action *based upon theories within the coverage of the relevant policy.*

*Id.* at 435 n. 16 (emphasis added), *citing Hogan v. Midland-National Insurance Co.*, 3 Cal.3d 553, 91 Cal.Rptr. 153, 476 P.2d 825, 832 (Cal.1970).

█ Where, as here, a settlement is reached in a suit which alleged several grounds for relief, some within policy coverage and some not, the liability imposed by the settlement agreement is not necessarily within the coverage of the policy. Since the basis for liability in such a situation has not been "necessarily determined," we believe the insurance company should be permitted to contest coverage. We therefore hold that, where an insurance company has wrongfully refused to defend, it may nevertheless in a subsequent action on the policy attempt to show that the liability is not covered by the policy, where liability is imposed by a settlement agreement in a case involving both claims within policy coverage and claims not within policy coverage. If such liability *is* subsequently found to be covered by the policy, the insurer may then be held liable, at least up to the policy limits, for the full amount of any obligation reasonably incurred by the insured in the settlement. If, however, the liability of the insured is found not to be within the coverage of the policy, the insurer is not liable for obligations incurred by the insured in a settlement, even though the settlement is reasonable. *See generally* R. Keeton, Basic Text on Insurance Law § 7.6(e), at 487–88

(1971); Comment, *The Insurer's Duty to Defend Under a Liability Insurance Policy*, 114 U.Pa.L.Rev. 734, 739–45 (1966).

█ In the case at bar, the Afcans' amended complaint in the original suit against Barclay stated both claims covered by the policy and claims not covered by the policy. No judgment was obtained in the initial proceeding; the case was settled out of court. In achieving this settlement Barclay necessarily incurred attorney's fees, and he assumed an obligation to pay $60,000 to the Afcans. Also as part of the settlement, Barclay assigned to the Afcans whatever rights he had against Mutual Fire.

Barclay clearly had the right to recover from Mutual Fire the reasonable costs and attorney's fees incurred in the defense and settlement of the claim. That, however, is the only right that Barclay had against Mutual Fire. In its well-reasoned decision on the parties' cross-motions for summary judgment, the trial court found, on the basis of undisputed facts, that the insurance policy did not provide errors and omissions coverage for trustees and that Barclay, in the transactions complained of, acted solely as a trustee. Since any liability was determined to be outside the coverage of the policy, Barclay had no right to indemnification from Mutual Fire.[6] Since the Afcans' rights against Mutual Fire are co-extensive with those of Barclay, on remand the court should award to the Afcans the costs and attorney's fees for which Mutual Fire would have been liable to Barclay. Since they are now the prevailing parties, the Afcans presumably will also be entitled under Civil Rule 82 to an award of attorney's fees which they have incurred in this action.

REVERSED and REMANDED.

---

**6.** Mutual Fire contends, in light of the covenants given by the Afcans in the settlement agreement and the "hold harmless" clause appended thereto, that Barclay effectively incurred no liability in executing the $60,000 promissory note. Since we find that Mutual Fire was not liable to Barclay in any case, we do not address the issue of whether Barclay actually incurred any liability.