CONTINENTAL INSURANCE COMPA-
NY and Arthur Stanford, Appellants,

v.

BAYLESS AND ROBERTS,
INC., Appellee.

BAYLESS AND ROBERTS, INC.,
Cross-Appellant,

v.

CONTINENTAL INSURANCE COMPA-
NY and Arthur Stanford,
Cross-Appellees.

Nos. 2922, 2923.

Supreme Court of Alaska.

March 7, 1980.

Sanford M. Gibbs, Hagans, Smith, Brown, Erwin & Gibbs, Anchorage, for appellants and cross-appellees.

Warren W. Matthews, Jr., Matthews, Dunn & Bailey, Anchorage, Lance C. Parrish, Fairbanks, for appellee and Cross-appellant.

## OPINION

Before BOOCHEVER, C. J., RABINOWITZ, CONNOR and BURKE, JJ., and DIMOND, Senior Justice.

BURKE, Justice.

This appeal presents issues arising from an insurance company's refusal to unconditionally defend its insured and the insured's subsequent decision to settle the case.

Appellee Bayless and Roberts, Inc. (hereinafter B & R) was one of three defendants in a wrongful death action. B & R's defense in that action was undertaken by its liability insurance carrier, appellant Continental Insurance Company, pursuant to the terms of its insurance contract. As the case proceeded to trial Continental became convinced that B & R, through one of its officers, had breached its duty to cooperate in the defense of the case. As a result, Continental informed B & R that it would continue to defend only if B & R would agree to a reservation of Continental's right to later deny liability on the ground of the alleged breach. B & R refused to accept such a conditioned defense and, therefore, Continental withdrew from the case.

B & R settled the tort action, agreed to entry of a consent judgment for $618,000, and then sued Continental and its chief adjuster to recover the amount of the judgment as well as punitive damages. The case went to trial and resulted in an award of $622,000 in damages to B & R, based on the jury's finding that Continental and its adjuster, Arthur Stanford, had negligently conducted B & R's defense, and that the insurance company had breached its duty to defend its insured. Continental and Stanford then brought this appeal. We affirm the judgment of the superior court.

### I. Facts

On May 22, 1970, Marvin Warbelow was fatally injured by the explosion of a paint pot which he was using to paint an aircraft. His widow subsequently filed an action for wrongful death and a survival action in the superior court, naming as defendants B & R, the owner of the paint pot; Decora, Inc., the manufacturer of the paint pot; and

Sears, Roebuck and Co., the seller of the air compressor and regulator that supplied air pressure to the paint pot.

Pursuant to the terms of its insurance contract,[1] Continental undertook the defense of B & R in the action, retaining an experienced attorney, Richard Gantz of Hughes, Thorsness, Lowe, Gantz and Clark of Anchorage, for that purpose. During the course of its investigation of the case, Continental sent an investigator to take a statement from Robert Roberts, an officer of B & R. Roberts explained in his statement that he had agreed to lend the paint pot to Warbelow, who was a business customer and close friend of Roberts. This statement was forwarded to attorney Gantz who used it to prepare an affidavit which he planned to file in support of a motion for summary judgment.[2] Roberts signed this affidavit on December 2, 1971, slightly more than a year and a half after Warbelow was injured. About eleven months later, on October 25, 1972, Roberts's deposition was taken in Anchorage. Gantz, who was unable to be present at the deposition, sent one of his associates, Jonathan Link, to appear on B & R's behalf. During the deposition Roberts denied all knowledge of the circumstances of the transfer of the paint pot to Warbelow.[3] Thus, Roberts's deposition testimony was in conflict with his previous statement to Continental's investigator and his signed affidavit. Whether Link attempted to prepare Roberts for the deposition by showing him a copy of his previous statement or affidavit is disputed. Although Link was aware of the contradiction in Roberts's statements, he did not stop the taking of the deposition to consult with Roberts. Immediately following the deposi-

---

1. The policy provided in pertinent part (emphasis added):

 The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of
 A. bodily injury or
 B. property damage
 to which this insurance applies, caused by an occurrence, *and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent*, and may make such investigation and settlement of any claim or suit as it deems expedient, but the company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements.

2. Roberts's affidavit, which was based on the information in his statement to the investigator, stated in pertinent part:

 Some time in the late winter or early spring of the year 1970 the decedent Marvin Warbelow indicated to me that he wished to do some painting and that he was looking for a paint pot for that purpose. I told him that I had seen this particular piece of equipment which had been identified to me as a paint pot lying around, and that, while I had no idea what condition it was in or whether it was workable, he could take it if he wanted to. Whether it was a loan or a gift was not discussed as we had never used the pot and had no use for it.

3. During the deposition, Roberts made the following statements:

 Q. [Counsel for Sears, Roebuck & Co.] Are you familiar with the circumstances of how the paint tank got into the possession of Marvin Warbelow?
 A. [Roberts] No.
 Q. Do you know how it got into his possession?
 A. No.
 Q. O.K. Do you know how it left the location where it was at the Standard Oil bulk plant and got to Cathedral Bluffs?
 A. Only that they—somebody picked it up. That is all I know.

 . . .

 Q. [Counsel for Decora, Inc.] Well, how do you suppose that Marvin Warbelow got that paint pot, if he did get it at all?
 A. Just picked it up and took it. Whether he took it or one of his hired men took it, I don't know.
 Q. *Nobody came and asked you for permission to use it?*
 A. No.

 . . .

 Q. [Counsel for Warbelow] And you do not—you personally do not know how Marvin Warbelow obtained that paint pot?
 A. No.

 . . .

 Q. [Attorney Link, counsel for B & R] Did you ever know that Marvin was going to use that paint pot?
 A. No, I didn't know.

tion Link met with Roberts, and they discussed the need to change the deposition before it was signed. *See* Rule 30(e), Alaska R.Civ.P. Gantz, however, subsequently decided not to correct the deposition, although he did write a letter to Roberts pointing out the inconsistencies in his statements and emphasizing the necessity of telling the truth at trial.

The trial of the Warbelow matter began on November 27, 1972, in Fairbanks. In his opening statement to the jury, Gantz stated that Roberts had lent the paint pot to Warbelow. This statement of the facts, which was based on Roberts's affidavit, was in accord with the facts outlined in Gantz's pretrial memorandum. Since this description of Warbelow's acquisition of the paint pot, however, was inconsistent with Roberts's deposition, Decora, one of the other defendants in the case, moved under Civil Rule 37(d) for sanctions and a dismissal of the cross-claim filed against Decora by B & R. On December 9, Gantz wrote to Arthur Stanford, Continental's claims adjuster, indicating that Roberts's deposition presented a "real problem" and might be "very damaging." The letter also informed the insurance company that Decora had moved for sanctions and dismissal of the cross-claim and that Warbelow might file a similar motion.

As Gantz had predicted, Warbelow subsequently joined in Decora's motion for sanctions. On December 19, the trial court, proceeding under Civil Rule 37(d), dismissed B & R's cross-claim against Decora as a sanction for Roberts's "false swearing." [4]

The court imposed no sanctions against B & R in respect to Warbelow's claim. Gantz subsequently informed Stanford of the situation and suggested to Stanford that it might be appropriate for Continental at that point to send B & R a reservation of rights letter. At Stanford's request, Gantz drafted a form letter and sent it to Stanford.

When Decora moved for sanctions and again when sanctions were imposed, Gantz explained to Roberts that it might be possible for Continental to raise a policy defense based on the judge's ruling. Gantz offered to withdraw from the representation of B & R because of his potential conflict of interest. The first time Gantz discussed this with Roberts, Roberts indicated he was satisfied with the representation. Following another discussion with Gantz early in January, however, B & R retained the firm of Ingraham and Niewohner in Fairbanks to represent its interests. Continental, in turn, retained the firm of Hagans, Smith and Brown.

By January 7, 1973, attorney Ingraham had learned of the current status of the case, including the fact that Decora and Sears had settled with Warbelow for $108,125 and $350,000 respectively, and that Warbelow had made a settlement offer to B & R of $160,000. [5] On January 8, Ingraham wrote to Continental demanding that it accept the outstanding settlement offer of $160,000, contending that such an offer was within policy limits. [6] On January 9, Continental delivered to Ingraham the reserva-

---

4. Rule 37(d), Alaska R.Civ.P., authorizes the court to impose sanctions when a party fails to appear for a deposition. Among the authorized sanctions is "[a]n order . . . dismissing the action or proceeding or any part thereof . . . ." Rules 37(b)(2)(C) & 37(d), Alaska R.Civ.P. The court's imposition of sanctions was not appealed, and we do not comment on its propriety. Also on December 19, the court declared a mistrial because several jurors had developed serious time conflicts. Selection of jurors for a new trial started on January 2, 1973.

5. Following resumption of the trial in January, Gantz approached Bob Parrish, attorney for Warbelow, to discuss a possible settlement fig-

ure. Parrish gave no explicit response, but during a subsequent recess, without comment, he dropped a piece of paper on the table in front of Gantz. This paper had the figure 160,000 written on it. Gantz assumed that this was a settlement offer and relayed this information to Continental and to Roberts. Parrish later told Ingraham that a settlement offer was outstanding for $160,000. Gantz recommended that Continental accept the offer, but it refused.

6. The face amount of the policy was $100,000. Since the policy also provided for payment of costs and attorney's fees, however, the $160,000 figure did not necessarily exceed the policy limits.

tion of rights notice which Gantz had prepared on December 20. The notice, which was in the form of a letter to B & R from Continental's attorney Keith E. Brown, stated that Continental would continue to conduct its defense of B & R but would "reserv[e] the right to disclaim coverage should liability be found against Bayless and Roberts, based upon the findings of Judge Taylor."[7] Ingraham rejected the proposed defense under a reservation of rights on the same day that Brown's letter was delivered and demanded an unconditional defense by Continental. This demand was rejected, and in a telephone call to Ingraham, Brown stated that Continental's intention was to continue to defend B & R under a reservation of rights. On January 11, B & R entered into a consent judgment in favor of Warbelow for $618,-000. That same day Warbelow and B & R signed an agreement whereby Warbelow agreed not to execute on the judgment against any assets of B & R except its claim against Continental. In return, B & R agreed to prosecute its claim against Continental and to assign any proceeds of that claim to Warbelow.[8]

In compliance with that agreement, on February 8, 1973, B & R filed suit against Continental and Stanford. The complaint alleged that Continental's refusal to defend except under a reservation of rights constituted a breach of its fiduciary duty to B & R. It also alleged that Stanford breached his fiduciary duty in failing to adequately investigate the Warbelow claim and in failing to fully inform B & R, Continental, or Gantz of the facts of the case. Continental then counterclaimed, alleging that B & R had breached its obligation under the policy to cooperate in the defense of the claim.

The case was tried before a jury. At the end of the trial Stanford moved for a directed verdict on the issue of his liability, but the court denied that motion on the ground that Stanford did owe a fiduciary duty to B & R. Stanford appeals this decision. The court then granted B & R's motion for a directed verdict against Continental on the issue of B & R's alleged breach of the cooperation clause, instructing the jury that B & R had fulfilled its duty of cooperation. Continental appeals the granting of this motion.

The case then went to the jury on four issues: (1) Did Stanford, in his individual capacity as a claims adjuster, act negligently toward B & R? (2) Did Continental act in bad faith toward B & R? (3) Did Continental act negligently toward B & R? (4) Did Continental breach its duty to defend B & R?

The jury found that Stanford had acted negligently and that he was liable to B & R for $10,000. The jury found that, although Continental had not acted in bad faith, it had acted negligently and had breached its duty to defend B & R. In accordance with the court's instructions, the jury then awarded to B & R $618,000 in damages for Continental's negligence and $4,000 in damages for its failure to defend.[9]

Continental subsequently moved for a reduction of the verdict by the amounts paid to Warbelow by Decora and Sears under their settlement agreements. The court denied that motion, and Continental appeals that decision. Both Continental and Stanford also moved for judgment notwithstanding the verdict or for a new trial, on

---

7. The letter continued: "If the facts are as we understand them, and if the Judge's ruling remains in effect, the statements of Mr. Roberts constitute a wilful failure to cooperate in the defense of the law suit and as a result thereof, there may be a lack of insurance coverage."

8. In a subsequent amendment to this agreement B & R also agreed to pursue its claim against Richard Gantz; Hughes, Thorsness, Lowe, Gantz and Clark; Underwriters Adjusters; and Arthur Stanford, and to assign any proceeds thereof to Warbelow.

9. The court later ruled that Stanford's liability was a joint obligation of Continental and Stanford and, as such, was "a part of and not cumulative of the verdict against Continental . . . ." The total judgment in favor of B & R was $803,358.25: jury verdict of $622,000; prejudgment interest at 6%, amounting to $101,510.40; attorney's fees of $73,201 under Rule 82, Alaska R.Civ.P.; and costs of $6,646.85.

the basis of various errors allegedly committed during the trial. The court denied these motions, and Continental and Stanford also appeal that decision. B & R has filed a cross-appeal, contending that the trial court gave inadequate instructions on the issue of Continental's good faith and that, if the judgment is reversed, it should have a new trial on that issue.

## II. Liability of Insurance Adjuster Stanford

Arthur Stanford was the branch manager of Underwriters Adjusting Company in Anchorage. Underwriters Adjusting is a subsidiary of Continental Corporation and functions as the claims department of Continental Insurance Company, another subsidiary of Continental Corporation. Continental assigned the adjustment of the Warbelow claim against B & R to Stanford.

B & R's complaint in the instant case included the following allegation relevant to Stanford:

> Defendant Stanford failed to adequately investigate the Warbelow claim, failed to inform plaintiff of the facts which he had determined, and failed to fully inform defendant Continental or the attorney employed by it of the facts of the case. These acts were done with gross and wanton disregard for the interests of Bayless and Roberts, Inc. and in breach of a fiduciary duty.

The evidence adduced at trial on this issue fell into two categories. First, plaintiffs introduced proof that, although Stanford knew of the inconsistency in Roberts's testimony on November 13, 1972, and was informed by Gantz on December 9, 1972, that the deposition presented a "real problem," he did not inform B & R of the conflict of interest and potential policy defense. Second, Stanford testified that, although prior to the Roberts deposition Continental had authorized him to settle the case for $10,000, he had never communicated this fact to Gantz nor had he ever offered that amount during the course of the case. At the close of the evidence, Stanford moved for a directed verdict on the issue of his liability to B & R, and the trial court denied the motion.

Stanford contends on appeal that he had no duty to B & R under his contract with Continental which would subject him to personal liability. He relies on two California cases which stand for the proposition that, since a claims adjuster is not a party to the contract of insurance, he is not bound by the implied covenant of good faith and fair dealing and thus owes no duty to comply with that covenant. *Gruenberg v. Aetna Insurance Co.*, 9 Cal.3d 566, 108 Cal.Rptr. 480, 487, 510 P.2d 1032, 1039 (1973); *Iverson v. Superior Court*, 127 Cal.Rptr. 49, 51 (Cal. App.1976).

In *Iverson*, the insured sued his insurance company's claims supervisor for failure to accept a settlement within policy limits. The *Iverson* court held that, although an unreasonable failure to settle would constitute a breach of the insurer's contractual duty of good faith and fair dealing, the claims supervisor owed no contractual duty of good faith to the insured. 127 Cal.Rptr. at 51. The *Iverson* court, however, specifically distinguished that situation from one in which an agent of the insurer committed a tort against the insured. The court held that the agent's liability would depend upon the plaintiff's theory of recovery:

> [Plaintiff] argues that an employee is always liable for his own torts regardless of whether his employer is also liable. The argument ignores the proposition that the employee is liable only if his conduct is tortious breach of duty. Iverson did not breach a duty of good faith owed by him. No other tort is alleged by [plaintiff], it having apparently abandoned its untenable claim that the pleading incorporates a cause of action for fraud.

*Id.* (citation omitted). Thus, under *Iverson's* reasoning, Stanford could not be held liable for a breach of the fiduciary duty of good faith arising out of the insurance contract, but he could be held liable for negligence arising out of a breach of the general tort duty of ordinary care.

 This conclusion is consistent with our decision in *Austin v. Fulton Insurance*

*Co.*, 498 P.2d 702 (Alaska 1972). In *Austin*, we recognized that an insurance agent could be held liable for his negligent failure to insure the plaintiff's house against earthquake damage: "The law is well established that in the event of negligence by a disclosed agent acting within the scope of his authority the agent may be held personally liable to a third party." *Id.* at 704 (footnote omitted). We conclude that there was evidence from which the jury could reasonably find that Stanford had not exercised ordinary care in respect to B & R.[10] Where the evidence, viewed in the light most favorable to the non-moving party, is such that reasonable people could differ in their judgment, the question is one for the jury to decide. *See Holiday Inns of America, Inc. v. Peck*, 520 P.2d 87, 92 (Alaska 1974). We therefore affirm the decision of the superior court denying Stanford's motion for a directed verdict.

### III. B & R's Refusal to Accept a Conditional Defense

■ Continental contends that the trial court should have granted its motion for summary judgment on the ground that, as a matter of law, B & R breached the policy by refusing to accept Continental's offer to defend under a reservation of rights. Continental contends that it should be able to conduct the insured's defense without giving up its right to refuse to pay an adverse judgment if it can later establish that the insured breached a condition of the policy. B & R's position is that Continental cannot have it both ways. B & R contends that Continental must either (1) affirm the policy, defend the suit, and pay any resulting adverse judgment, thus waiving both the alleged breach by the insured and any possible coverage defenses, or (2) repudiate the policy and withdraw from the defense, taking its chances that its claim of a breach by the insured would stand up in a subsequent suit on the policy.

Continental acknowledges that the general rule is that, if an insured refuses to accede to the insurer's reservation of rights, the carrier must either accept liability under the policy and defend unconditionally or surrender control of the defense and be held liable if it guessed wrong on the coverage issue. *See Boise Motor Car Co. v. St. Paul Mercury Indemnity Co.*, 62 Idaho 438, 112 P.2d 1011, 1016 (1941). Continental, however, urges us to reject that rule and adopt the approach of the Oregon Supreme Court in *Ferguson v. Birmingham Fire Insurance Co.*, 254 Or. 496, 460 P.2d 342 (1969). Under *Ferguson*, where the insurer defends and there is a conflict of interest between the insurance company and the insured in the original litigation, a judgment in that action does not operate as an estoppel to prevent the insurance company from contesting coverage in a later action. The *Ferguson* court therefore found that it was unreasonable for the insured to insist that the insurance company either withdraw from the case or defend and waive its right to later litigate the question of coverage. *Id.* at 349.

Both *Boise* and *Ferguson*, however, are distinguishable from the case at bar. In *Boise* and *Ferguson* the insurance company refused to defend because it believed that the claim was not covered by the policy. In the case at bar, Continental is not contesting coverage in that sense. Continental's contention is that the policy is unenforceable because of the insured's breach of the cooperation clause.[11] While Continental was willing to proceed with B & R's defense, it insisted on reserving its right to later challenge B & R's right to claim the protection of the policy, by asserting the insured's alleged breach as a defense in a later action to enforce the policy.

Applying traditional principles of contract law, we perceive a substantial distinction between the two situations. In the

---

10. The duty to settle and the duty to protect the interest of the insured are generally considered to be duties which sound in tort rather than contract. *See* Keeton, *Liability Insurance and Responsibility for Settlement*, 67. Harv.L. Rev. 1136, 1138 & n. 5, 1168 (1954).

11. The cooperation clause is set forth in note 18 *infra*.

first, where the insurer asserts a *coverage defense,* the insurer admits the validity of the policy but contends that a particular claim does not come within the coverage provided by the policy. In the second situation, where the insurer asserts a *policy defense,*[12] the insurer admits that the claim comes within the coverage provided by the policy but contends that the policy itself is unenforceable because of the insured's breach of a condition of the policy. In short, the insurer repudiates the contract and refuses to perform because of a prior breach by the other party. *Boise* and *Ferguson* represent two possible approaches to the *coverage defense* situation. The case at bar, however, involves an asserted *policy defense,* and we do not believe that the two situations necessarily involve the same considerations. In reaching our decision, therefore, we consider only the policy defense situation. We leave open the question whether the insurer has the same obligations and liabilities in the coverage defense situation.[13]

The purpose of the *Boise* rule—that an insured need not accept the insurance company's offer of a conditional defense under a reservation of rights—is to avoid conflicts of interest between the company and its insured. Two types of conflicts are foreseeable in the reservation of rights situation. The first conflict which may arise, if the insurer knows it can later assert non-coverage, is that it may offer only a token defense of its insured. If the insurer does not think that the loss on which it is defending will be covered under the policy, it may not be motivated to achieve the lowest possible settlement or in other ways treat the interests of its insured as its own. The second conflict arises when success on a particular theory of recovery in the case against the insured would result in the denial of coverage under the policy. In that case, the insurance company would have an interest in seeing the plaintiff obtain a verdict based on the theory under which no coverage would result. For example, if a plaintiff alleged both negligence and an intentional tort as alternative theories of recovery, an insurer operating under a reservation of rights might covertly frame its defense to achieve a verdict based upon commission of the intentional tort, so that it could later assert that the defendant was not covered, since the policy provided *no* coverage for intentional torts. In the absence of a reservation of rights agreement, however, the insurer would be liable *for* indemnification regardless of whether the verdict established negligence or an inten-

12. For a discussion of the distinction between "coverage defenses" and "policy defenses," see Browne, *The Demise of the Declaratory Judgment Action as a Device for Testing the Insurer's Duty to Defend: A Postscript,* 24 Clev.St.L. Rev. 18, 29–30 (1975).

13. The recent case of *Afcan v. Mutual Fire, Marine & Inland Ins. Co.,* 595 P.2d 638 (Alaska 1979), involved an asserted coverage defense. In *Afcan* we discussed in some detail the obligation of the insurer under the duty to defend clause in situations where it wishes to contest coverage. In *Afcan* we recognized that the duty to defend and the duty to indemnify are independent obligations. *Id.* at 645. We concluded that, regardless whether the claim does *in fact* come within the coverage provided by the policy, the insurer must defend if the complaint *alleges* a claim within policy coverage. *Id.* Thus the insurer may be required to defend, although the claim is in fact not covered. It is in that situation that the insurer frequently wishes to reserve explicitly its right to contest coverage so that the insured cannot later contend that the insurer's participation in the de-fense estopped it to deny coverage under the policy.

Afcan, however, dealt only with the consequences of the *failure* to defend. 595 P.2d at 646–47. We have not been confronted with the question, and we do not decide, whether the insurer's defense of a claim under a duty to defend clause does estop it to contest coverage later. We note that whether estoppel is applied may depend on whether the interests of the insurer and the insured were adverse in the original action. *See generally* Comment, *Estoppel, Third Party Practice, and Insurer's Defenses,* 19 U.Chi.L.Rev. 546 (1952); Note, *The Effect of Collateral Estoppel on the Assertion of Coverage Defenses,* 69 Col.L.Rev. 1459, 1465–69 (1969). *See also* Browne, *The Demise of the Declaratory Judgment Action as a Device for Testing the Insurer's Duty to Defend,* 23 Clev.St.L.Rev. 423 (1974); Note, *Liability Insurance Policy Defenses and the Duty to Defend,* 68 Harv.L.Rev. 1436, 1443 n. 38 (1955) (in a few jurisdictions defense based on noncoverage not subject to estoppel principles).

tional tort, and thus would be more likely to defend vigorously on both grounds. *See, e. g., Socony-Vacuum Oil Co. v. Continental Casualty Co.*, 144 Ohio St. 382, 59 N.E.2d 199, 204–05 (1945) (conflict created by alternative theories of recovery, *Boise* rule applied).

The court in *Ferguson* admitted that the overwhelming weight of authority holds that the two types of conflict described above justify not requiring an insured to accept a defense under a reservation of rights. 460 P.2d at 349. The *Ferguson* court, however, saw a way around each of the two types of conflict. In the first, more generalized conflict of interest situation, the court reasoned that the insurance company's knowledge of supposed jury sympathy toward an insured in a coverage dispute would prevent the insurer from providing a less than adequate defense on the merits:

> It is feared that if the insurer knows that it can later assert non-coverage, it may offer only a token defense in the action brought against the insured, or be less prone to effect a settlement advantageous to the insured.
>
> We think that this danger is minimal. The insurer knows that when it is the defendant in a lawsuit brought by one of the policy holders the jury's sympathy for the insured frequently produces a plaintiff verdict even when the insurer's case is strong. Knowing this, the insurer is not likely to relax its effort in defending the action against the insured. If the insurer feels certain that it can successfully defend an action brought against it by the insured, it is not likely to accept the insured's tender of the defense in the first place.

*Id.* (footnote omitted).

As to the second form of conflict, where a judgment on one theory of the case could affect the coverage issue, the *Ferguson* court reasoned that, when such a conflict exists, the estoppel by judgment rule should not be applied to the trial on coverage. The court held that the judgment in the original action should operate as an estoppel in the

subsequent coverage determination only when the interests of the insurer and insured in defending the original action were identical. Thus, under the *Ferguson* decision, if a plaintiff's alternative theories of recovery based on negligence and intentional tort posed a potential conflict of interest on the coverage issue, a finding by the jury that an intentional tort had been committed would not be binding in the later action to determine coverage:

> Where there is a conflict of interest between the insurer and insured and the judgment in the action against the insured can be relied upon as an estoppel by judgment in a subsequent action on the issue of coverage, the control of the action by the insurer could adversely affect the insured if the judgment was based upon conduct of the insured not falling within the coverage of the policy. Likewise, the insurer could be adversely affected by a judgment based upon conduct for which there is coverage. But we see no reason for applying the rule of estoppel by judgment in such cases. The judgment should operate as an estoppel only where the interests of the insurer and insured in defending the original action are identical—not where there is a conflict of interests. If the judgment in the original action is not binding upon the insurer or insured in a subsequent action on the issue of coverage, there would be no conflict of interests between the insurer and the insured in the sense that the insurer could gain any advantage in the original action which would accrue to it in a subsequent action in which coverage is in issue.

*Id.* at 348–49 (footnotes omitted).

While the *Ferguson* approach might be acceptable in the *coverage* defense situation for which it was developed,[14] we do not believe it is an adequate solution to the *policy* defense situation. The fact that, under the *Ferguson* approach, the insurer would not be estopped to assert the insured's breach as a defense in a subsequent

---

**14.** We do not decide that question. *See* text accompanying note 13 *supra*.

action on the policy does not sufficiently eliminate the conflict of interest in the original litigation. Even if the insurer vigorously and properly defended the claim against its insured, it could still take actions which could prejudice the insured's position in a later suit on the policy. If nothing else, the insurer might gain access to information, not otherwise properly available to it, which it could use to its advantage later to establish the insured's breach. Furthermore, if the insurer felt that its chance of prevailing in the later suit was fairly certain, it would not have the same interest in achieving a reasonable settlement that it would otherwise have.[15]

Because the application of the *Ferguson* approach to the policy defense situation would unacceptably compromise the interests of the insured, we reject it. The *Boise* approach requires the insurer to make a clear choice between defending and withdrawing, and, in the policy defense situation, we believe that approach is necessary to protect the interests of the insured. Thus, we decline to adopt in full the position of either party. It may be that, where the insurance company wishes to contest coverage, the insured is obligated to accept a defense under a reservation of rights.[16] We hold, however, that where, as here, the insurance company challenges the insured's

right to enforce the policy on the ground the insured has breached a condition thereof, the insured has a right to demand an unconditional defense. Thus, the insurance company must either affirm the policy and defend unconditionally or repudiate the policy and withdraw from the defense.[17] The insurer may not reserve its right to repudiate the policy, unless the insured consents to a reservation of that right.

In the case at bar, therefore, B & R was fully within its rights and did not breach of policy when it insisted that Continental either defend unconditionally or withdraw from the defense. The superior court properly denied Continental's motion for summary judgment.

## IV. Breach of the Cooperation Clause

At trial Continental contended that its refusal to defend B & R without a reservation of rights was justified since Roberts, as an officer of B & R, had breached the contractual duty of the insured to cooperate in the defense by giving willfully false testimony at his deposition.[18] After all the evidence was presented, however, the trial court directed a verdict in favor of B & R on this issue, finding that there was no evidence that Roberts had intentionally given false testimony.[19]

15. In fact, in the case at bar, it is conceivable that this very conflict played a role in Continental's refusal to accept Warbelow's settlement offer of $160,000, and offer arguably within policy limits. *See* notes 5 & 6 *supra*.

16. We do not decide whether an explicit reservation of rights is *necessary* in order to preserve the insurer's right to contest coverage. The necessity of the reservation depends on whether the insurer is considered to be estopped to deny coverage by its participation in the defense. *See* note 13 *supra*.

17. The possibility of a conflict might be avoided in such cases if the insurance company were to offer its insured the right to retain independent counsel to conduct his defense, and agree to pay all the necessary costs of that defense. In that event, it would seem that the company should be entitled to reserve the right to later litigate an alleged policy defense.

18. The terms of the insurance policy included the following condition:

*Insured's Duties in the Event of Occurrence, Claim or Suit*

. . . . .

(c) The insured shall cooperate with the company and, upon the company's request, assist in making settlements, in the conduct of suits and in enforcing any right of contribution or indemnity against any person or organization who may be liable to the insured because of bodily injury or property damage with respect to which insurance is afforded under this policy; and the insured shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses. The insured shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense other than for first aid to others at the time of accident.

19. Roberts testified at trial that he had been "confused" and "rattled" at the time of the deposition. Other witnesses testified that he was merely an inarticulate person who had been confused and perhaps frightened. The

■ A directed verdict on an issue is appropriate when the evidence is such that reasonable persons could not differ in their judgment. *See Holiday Inns of America, Inc. v. Peck*, 520 P.2d 87, 92 (Alaska 1974). However, we need not decide whether the evidence in this case was sufficient to avoid a directed verdict, since we have concluded that Continental's right to rely on B & R's alleged breach of its cooperation clause was barred on other grounds.

In *De Hart v. Illinois Casualty Co.*, 116 F.2d 685 (7th Cir. 1941), the United States Court of Appeals, Seventh Circuit, in a case involving a similar issue, said:

The discovery of perjury and assured's part therein gave to the insurance company an election of courses which it could pursue. It had, or at least it could assert it had, the option to withdraw then and there and deny liability because of lack of cooperation. On the other hand, it could waive its right and proceed with the trial and possibly win the case then about to be submitted to the jury.

*Id.* at 687. "The failure of an insurer to inform the insured promptly of its intention to deny liability, upon discovering facts [amounting to] a breach of the co-operation clause by the insured, constitutes a waiver of the breach." *State Farm Fire and Casualty Co. v. First National Bank*, 2 Ill.App.3d 768, 277 N.E.2d 536, 540 (1972) (citations omitted). *See also Ohio Casualty Insurance Co. v. Beckwith*, 74 F.2d 75 (5th Cir. 1935); *Allstate Insurance Co. v. Keller*, 17 Ill. App.2d 44, 149 N.E.2d 482 (1958); *Dougherty v. Hanover Insurance Co.*, 114 N.J.Super. 483, 277 A.2d 242 (1971); *Ziegler v. Ryan*,

66 S.D. 491, 285 N.W. 875 (1939); *Francis v. London Guaranty & Accident Co.*, 100 Vt. 425, 138 A. 780 (1927); *Nationwide Mutual Insurance Co. v. Gentry*, 202 Va. 338, 117 S.E.2d 76 (1960).

■ The alleged breach of the cooperation clause occurred on October 25, 1972, when Roberts's deposition was taken. Attorney Gantz was immediately aware of the conflict that had arisen in Roberts's testimony, and the possibility of a policy defense based on that conflict. Such knowledge on the part of Gantz, we believe, was imputed to his principal, Continental. By its failure to inform B & R of its intention to deny liability, until well after trial had begun, Continental waived this alleged breach of its cooperation clause as a matter of law.

■ We are also convinced that Continental's right to rely on the alleged breach was barred by principles of estoppel.

After a deposition has been transcribed, the witness deposed can make any change in the deposition he desires. "Any changes in form or substance which the witness desires to make shall be entered upon the deposition by the officer [before whom the deposition was taken] with a statement of the reasons given by the witness for making them." Rule 30(e), Alaska R.Civ.P. As previously noted, Gantz elected not to make any effort to have Roberts correct his deposition before proceeding to trial. This course of conduct not only jeopardized B & R's ability to defend against the claim of Warbelow, but also exposed B & R to the possibility of a policy defense being raised by Continental. Such conduct, we believe,

---

law is clear that testimony must be intentionally false in order to constitute a breach of a cooperation clause. *See, e. g., Employers Mut. Cas. Co. v. Nelson*, 109 N.H. 6, 241 A.2d 207 (1968). *See also* 8 J. Appleman, Insurance Law and Practice § 4782 (1962 & Cum.Supp.1973 & Supp. 1979). In many jurisdictions it is also required that any breach of the cooperation clause must substantially prejudice the insurer in defending the action. *See, e. g., Baumler v. State Farm Mut. Auto. Ins. Co.*, 493 F.2d 130 (9th Cir. 1974) (Arizona law); *M. F. A. Mut. Ins. Co. v. Cheek*, 66 Ill.2d 492, 6 Ill.Dec. 862, 363 N.E.2d 809 (1977); *Oregon Auto. Ins. Co. v. Salzberg*, 85 Wash.2d 372, 535 P.2d 816 (Wash.

1975). *Contra Mariani v. Bender*, 85 N.J.Super. 490, 205 A.2d 323 (1964); *Coleman v. New Amsterdam Cas. Co.*, 247 N.Y. 271, 160 N.E. 367 (1928). *See generally*, 8 J. Appleman, *supra* at § 4773; Keeton, *Ancillary Rights of the Insured Against His Liability Insurer*, 28 Ins. Counsel J. 395, 401–02 (1961); Note, *Liability Insurance Policy Defenses and the Duty to Defend*, 68 Harv.L.Rev. 1436, 1437–39 (1955); Note, *M. F. A. Mutual Insurance Co. v. Cheek: Illinois Adopts a Prejudice Standard for Policy Defenses Based on Breach of Cooperation*, 9 Loyola U.L.J. 506 (1978). Whether a showing of prejudice is required has not been determined in Alaska.

on the part of the attorney employed by an insurance company to defend its insured, forecloses the insurance company from asserting a breach of the cooperation clause against its insured. *See Van Dyke v. White*, 55 Wash.2d 601, 349 P.2d 430, 434 (1960).

We therefore affirm the trial court's decision to grant B & R's motion for a directed verdict.

## V. Liability Above Face Amount of Policy

■ The jury found that Continental had acted negligently, and it awarded B & R $618,000 in compensatory damages. Since the jury failed to find that Continental had acted in bad faith, Continental contends that the trial court erred in denying its motion for judgment notwithstanding the verdict or a new trial. Continental argues that its liability could not exceed policy limits: "The jury's finding that Continental 'negligently defended its insured' cannot support an award of damages greater than the carrier's $100,000 obligation under the policy."

■ We reject Continental's argument and join those jurisdictions holding that an insurer, defending an action against the insured, is bound to exercise that degree of care which a man of ordinary prudence would exercise in the management of his own affairs, and if the insurer fails to meet that standard it *is liable to the insured for the excess of the judgment over the policy limits, irrespective of fraud or bad faith.* That is to say, an insurer undertaking a defense must exercise not only good faith, but also ordinary care and reasonable diligence and caution.

7C J. Appleman, Insurance Law and Practice § 4687, at 1780 (Berdal ed. 1979) (footnotes omitted, emphasis added). *See Crisci*

*v. Security Insurance Co.*, 66 Cal.2d 425, 58 Cal.Rptr. 13, 17–18, 426 P.2d 173, 177–78 (1967); *Rova Farms Resort, Inc. v. Investors Insurance Co. of America*, 65 N.J. 474, 323 A.2d 495, 507–13 (1974).[20] We think the "responsibility devolving upon the insurer under modern conditions" is accurately described as follows:

> It has more than a duty of care of an ordinary man unskilled in litigation; it must exercise more than mere good faith. It is a professional which advertises by all media of mass communication its skill in the investigation, settlement, and litigation of liability cases. It asks the individual, who is an amateur in these matters but who would be deeply concerned over a case in which he is personally interested, to substitute its skill for his, its judgment for his judgment, and its conduct for his own acts. It then becomes chargeable with a greater duty—even as the brain surgeon must exercise greater knowledge, judgment, and skill in a brain operation than would a general practitioner of medicine. *It is not an extraordinary degree of care but the care that is required under these particular circumstances.* It must use skill diligently and adequately to investigate a case, it must use skill in negotiation, ·it must select skilled trial counsel—not the lowest priced member of the bar—and that individual, so selected by it, may bind the insurer by this derelictions. It is not a comfortable spot for a liability insurer to occupy, but it seeks the business on the basis of its skill. Even as an attorney, abstractor, accountant or physician may be liable if he fails to use the degree of skill in the handling of a professional matter that one is entitled to expect of one possessing like training and abilities, so must the insurer accept legal duties commensurate with its responsibilities.

**20.** Here, of course, the liability of B & R was based on a settlement agreement with Warbelow rather than a judgment on the merits. An insurance company is not automatically liable for the full amount of any such settlement negotiated by its insured regardless of the amount or reasonableness thereof. The trial court recognized this and properly instructed

the jury: "A reasonable settlement or consent judgment is one which under the circumstances existing at the time that it was entered into was made as ordinary or reasonable prudence and caution might dictate to be advisable." Thus, the jury was required to determine whether the amount of the settlement was reasonable under the circumstances, which it apparently did.

7C J. Appleman, *supra* at § 4687, at 181–82 (footnote omitted, emphasis added).

■ Continental also contends that an insurance company may not be held liable over policy limits for the negligence of an attorney such as Gantz, arguing that one in his position is an independent contractor. Much of the testimony that was introduced at trial to establish the negligence of Continental actually related to the conduct of Gantz, the attorney retained by Continental to represent B & R.[21]

Continental urges us to adopt the rule that an insurer cannot be held vicariously liable for the negligent conduct of an independent trial attorney whom the carrier has hired to conduct litigation. In *Merritt v. Reserve Insurance Co.*, 34 Cal.App.3d 858, 110 Cal.Rptr. 511 (1973), the California Court of Appeal held that if an independent attorney, retained by an insurer to perform professional services, negligently conducts the defense of the insured, "the remedy for this negligence is found in an action against counsel for malpractice and not in a suit against counsel's employer to impose vicarious liability." *Id.* at 527. The *Merritt* court reasoned that the insurance company should not be held liable for the negligent acts of its independent contractor, especially since the duty to defend an insured is delegable. Under Alaska law, if Gantz is viewed as an independent contractor and not an agent, Continental could not necessarily be held liable for his negligence. *See Morris v. City of Soldotna*, 553 P.2d 474 (Alaska 1976).

We decline to follow *Merritt* in this case. Gantz was selected by Continental to carry out its contractual duty to defend B & R. While there is no suggestion that in doing so his motives and intent were anything but honorable, it is quite apparent that both Gantz and Continental believed that his first loyalty was to Continental, and that throughout the course of the litigation he acted for and on behalf of the insurance company. For example, on December 20, 1972, Gantz advised Stanford of the superior court's order imposing sanctions. In a letter to Stanford he stated:

> It is our judgment that the action taken by the Judge is sufficiently serious and there is sufficient doubt as to the legality of his action that we should file a Petition for Review to the Supreme Court and ask for a stay of the trial until that petition is ruled on. *We will not proceed with such action, however, until you have contacted the insurance carrier and have received word that this is in accordance with their wishes.* [Emphasis added.]

Further indication of this overriding concern for the insurer can be discerned from the fact that it was Gantz who suggested to Stanford at that time that the company should sent a reservation of rights letter and Gantz who prepared a draft of the same for the company's consideration. Given these circumstances, we reject the holding in *Merritt* for the view expressed in *Smoot v. State Farm Mutual Automobile Insurance Co.*, 299 F.2d 525 (5th Cir. 1962): "The duty to defend is an important and frequently distinguishable part of the insurance contract. Those whom the Insurer selects to execute its promises, whether attorneys, physicians, no less than company-employed adjusters, are its agents for whom it has the customary legal liability." *Id.* at 530 (citations and footnote omitted).

■ Thus we conclude that the superior court properly denied Continental's motion for judgment notwithstanding the verdict or a new trial.[22]

---

**21.** There was testimony that Gantz or his associate Link failed to prepare Roberts properly for his deposition; that Gantz or Link failed to correct Roberts's erroneous statement during the deposition; *that Gantz failed to correct the deposition before Roberts signed it;* that Gantz failed to advise B & R promptly of the conflict of interest that had developed; that Gantz failed to oppose the Rule 37(d) motion for sanctions with sworn testimony. Some of this testimony was disputed. We intimate no opinion on whether the alleged conduct was negligent.

**22.** Continental also contends that the trial *court committed reversible error in instructing* the jury that in determining whether the $160,000 settlement offer came within policy limits, the jury should consider whatever costs and attorney's fees might have been assessed in the Warbelow litigation. According to Continen-

## VI. Reduction of Judgment Because of the Sears and Decora Settlement

■ On January 10, 1973, B & R reached an agreement with Warbelow, and a consent judgment was entered for the amount of $618,000. Continental contends that a consent judgment has the same legal effect as a judgment on a verdict and that the consent judgment against B & R for $618,000 in the Warbelow action was subject to reduction by the amounts of the settlements negotiated by Sears and Decora. It argues that such a reduction is required by the Contribution Among Joint Tortfeasors Act, particularly AS 09.16.010 and 09.16.040.[23]

We conclude that the statute does not require a reduction in the amount awarded under the consent judgment. Although the settlement reached by Warbelow and B & R was entered as a judgment, it was in essence a contract—a settlement agreement. It was certainly not an adjudication on the merits of the Warbelow claim. The nature of a consent judgment[24] has been aptly described by one court as

> one based on the consent or compromise agreement between the parties. A compromise or consent judgment is a bilateral contract wherein the parties adjust their difference by mutual consent, thereby putting an end to a lawsuit with each party balancing the hope of gain against the fear of loss. [Citations omitted.]

*Parkerson v. R–5, Inc.,* 305 So.2d 592, 595 (La.App.1974). *See generally* Comment, *Consent Judgments,* 72 Harv.L.Rev. 1314, 1316 (1959).

If the judgment had been the result of a judicial determination of the merits of the case, it might have been subject to reduction under AS 09.16.040(1);[25] or, under AS

---

tal, the jury was given no guidance as to how it should determine the amount of costs and attorney's fees that might be awarded against B & R in the Warbelow litigation, and *its* verdict, therefore, must have been based partly upon impermissible speculation. Our review of the entire record fails to convince us that the court erred in this regard.

**23.** AS 09.16.010 provides in pertinent part:

*Right to contribution.* (a) Except as otherwise provided in this chapter, where two or more persons become jointly or severally liable in tort for the same injury to person or property or for the same wrongful death, there is a right of contribution among them even though judgment has not been recovered against all or any of them.

(b) The right of contribution exists only in favor of a tortfeasor who has paid more than his pro rata share of the common liability, and his total recovery is limited to the amount paid by him in excess of his pro rata share. No tortfeasor is compelled to make contribution beyond his own pro rata share of the entire liability.

. . . . .

(d) A tortfeasor who enters into a settlement with a claimant is not entitled to recover contribution from another tortfeasor whose liability for the injury or wrongful death is not extinguished by the settlement nor in respect to any amount paid in a settlement which is in excess of what was reasonable.
AS 09.16.040 provides:

*Release or covenant not to sue.* When a release or covenant not to sue or not to enforce judgment is given in good faith to one of two or more persons liable in tort for the same injury or the same wrongful death

(1) it does not discharge any of the other tortfeasors from liability for the injury or wrongful death unless its terms so provide; but it reduces the claim against the others to the extent of any amount stipulated by the release or the covenant, or in the amount of the consideration paid for it, whichever is the greater; and

(2) it discharges the tortfeasor to whom it is given from all liability for contribution to any other tortfeasor.

**24.** Continental has characterized the judgment as a "confession of judgment" rather than a "consent judgment." We believe it is more properly considered a "consent judgment."

A judgment by consent is distinguished from a judgment by confession, in that its special characteristic is the settlement between the parties of the terms, amount, or conditions of the judgment to be rendered; the first presupposes an agreement of the parties as a basis for it, and the latter an act of defendant alone. They also differ in that the court exercises a certain amount of supervision over the entry of judgments by confession, and equitable jurisdiction over their subsequent status.
49 C.J.S. *Judgments* § 134 at 269 (1947) (footnotes omitted).

**25.** Quoted in note 23 *supra.*

09.16.010,[26] such a judgment might have entitled B & R to contribution from Sears and Decora. Such is not the case, however. Although a consent judgment was entered, B & R's liability resulted from a settlement agreement, not from an adjudication. The amount of the settlement was negotiated by the parties, *and the settlement was found to be reasonable by a jury that had before it evidence of the Sears and Decora settlements.*[27] Since both Warbelow and B & R were fully aware of the Sears and Decora settlements when they agreed to settle the case for $618,000, it must be assumed that they, like the jury, took those prior settlements into consideration in agreeing on the $618,000 amount. Neither the law (AS 09.16.010 and AS 09.16.040) nor common sense requires that one settlement be reduced by the amount of a prior settlement. The superior court therefore properly denied Continental's motion for a reduction of the judgment.

## VII. Conclusion

 Having considered all allegations of error urged by Continental,[28] we conclude that there was no error. We therefore affirm the judgment of the superior court.

AFFIRMED.

MATTHEWS, J., not participating.

**26.** Quoted in note 23 *supra.*

**27.** In fact, in closing argument on behalf of Continental, attorney Hagans argued that the settlement for $618,000 was unreasonable precisely because Warbelow had already received $458,000 from Sears and Decora. The jury, therefore, in deciding that the settlement was reasonable, presumably took the amount of the prior settlements into consideration.

**28.** Continental has alleged five additional grounds for reversal. First, it contends that the superior court committed reversible error in admitting into evidence the insurance policy issued by Continental to B & R. Second, Continental objects to the trial court's instruction to the jury that it should award B & R $4000 in damages, if it found that Continental had breached its duty to defend B & R. Third, Continental contends that a monograph on conflicts of interest in insurance cases and the testimony of several witnesses who were attor-

BOOCHEVER, Chief Justice, dissenting in part.

I agree with the majority opinion except that I believe the amount of the the judgment should be reduced by the amounts previously paid as a result of settlements with Sears and Decora. B & R entered a confessed judgment for $618,000.00 on January 10, 1973. At that time Warbelow had previously negotiated settlements with Sears for $350,000.00 and with Decora for $108,125.00.

AS 09.16.010(d) specifies:

A tortfeasor who enters into a settlement with a claimant is not entitled to recover contribution from another tortfeasor whose liability for the injury or wrongful death is not extinguished by the settlement nor in respect to any amount paid in a settlement which is in excess of what was reasonable.

Thus, Sears and Decora could not recover contributions from B & R.

AS 09.16.040 provides:

*Release or covenant not to sue.* When a release or covenant not to sue or not to enforce judgment is given in good faith to one of two or more persons liable in tort for the same injury or the same wrongful death

(1) it does not discharge any of the other tortfeasors from liability for the injury or wrongful death unless its terms

neys constituted evidence on the state of the law that was improperly admitted. Fourth, Continental objects to the superior court judge's failure to admonish the jury to disregard an allegedly improper argument to which the judge had sustained an objection. Fifth, Continental challenges the superior court's failure to give the jury written instructions on the Code of Professional Responsibility. We have considered each of these arguments and conclude that they are without merit.

In a cross-appeal B & R has alleged that the superior court gave erroneous instructions on the issue of Continental's good faith and the award of punitive damages. Because we affirm the judgment of the superior court in favor of B & R, it is unnecessary for us to consider the issue raised in the cross-appeal, since B & R urges us to do so only if the judgment is reversed.

so provide; but it reduces the claim against the others to the extent of any amount stipulated by the release or the covenant, or in the amount of the consideration paid for it, whichever is the greater; and

(2) it discharges the tortfeasor to whom it is given from all liability for contribution to any other tortfeasor.

According to this section, the amount of the judgment against B & R was to be reduced by the amounts·stipulated for the release of Sears and Decora.

B & R does not contest Continental's assertion that a confessed judgment is subject to reduction under the statute. Instead, it characterizes the judgment as a negotiated settlement, which would not normally be subject to reduction by the amount of the other settlements achieved in the same action. B & R points to the fact that the figure was negotiated by the attorneys representing the parties, and states that there was no special reason why a judgment was needed. However, the "settlement" was reduced to judgment, and the figures indicate that it was the intent of B & R and Warbelow to treat the amount of $618,000.00 as the total liability of all three defendants.

Warbelow had made an offer of settlement to B & R on January 7, 1973, in the amount of $160,000.00, apparently based on the belief that this covered the limits of Continental's liability under its policy insuring B & R ($100,000.00 plus costs and attorney's fees). It seems obvious that the amount of the confessed judgment was to cover this sum plus the amount of the two prior settlements, rounded to the nearest thousand dollars.

| | |
|---|---|
| Confessed Judgment | $618,000 |
| Total of Sears and Decora Settlements ($350,000 and $108,125) | − 458,125 |
| | $159,875 |

Thus, when the confessed judgment is reduced by the two settlements, the liability of B & R amounts to almost the identical sum as Warbelow's last settlement offer. The $618,000.00 represented the value of the Warbelow claim against all three defendants, and that amount due from B & R· should be reduced by the amount of the Sears and Decora settlements.

In the suit nominally brought by B & R against Continental, the jury found Continental liable on a negligence theory. The jury had been instructed that B & R claimed $618,000.00 as damages resulting from that negligence. The jury was not instructed as to the prior settlements and that the amount of the B & R judgment was subject to reduction by the sum of $458,125.00. Warbelow was the real party in interest in the suit against Continental, and the trial court erred in failing to reduce the judgment as required by the Contribution Among Joint Tortfeasors Act (AS 09.-16.010 and 09.16.040) by the amounts Warbelow was to receive under the other settlements. To hold otherwise results in a double recovery.

> The doctrine prohibiting double recovery supports the rule that a payment received by the plaintiff for a covenant not to sue someone potentially liable in tort must be deducted from the damages recoverable from persons whose tort liabilities arise out of the same circumstances.

*Luth v. Rogers & Babler Construction Co.,* 507 P.2d 761, 766 (Alaska 1973). In *Luth,* plaintiffs, injured in an automobile accident, entered into a covenant not to sue a potential defendant in consideration of payment of $3,500.00. Judgment was ·later obtained against Rogers & Babler in the amount of $7,000.00. The jury was not instructed as to the prior confession of judgment, similar to the situation here where the jury was not instructed as to the prior settlements. We held that the trial court employed the proper procedure in reducing the damages awarded by the amount of the prior settlement. *Id.*

Similarly, I believe that it was error not to reduce the amount of· B & R's judgment by the amount of the Sears and Decora settlements.