LLOYD'S & INSTITUTE OF LONDON UNDERWRITING COMPANIES, including John Crawley, individually and as Representative on Behalf of Certain Underwriters at Lloyds of London Subscribing to Policy No. BH0150TAA, Excess Insurance Company, Ltd.; London & Hull Maritime Insurance Co., Ltd.; Cornhill Insurance PLC 'M' A/C; Insurance Company of North America 'GA' (UK) The Prudential Group 9; and The Baltica (UK) 'J A', Appellants and Cross–Appellees,

v.

Christopher FULTON, individually and as assignee of Walter E. Clark, Appellee and Cross–Appellant.

Nos. S–8136, S–8185.

Supreme Court of Alaska.

May 12, 2000.

Rehearing Denied June 27, 2000.

Brewster H. Jamieson and Michael B. King, Lane, Powell, Spears, Lubersky, LLP, Anchorage, for Appellants/Cross–Appellees Lloyd's and Institute of London Underwriting Companies.

Randall E. Farleigh, Farleigh & Shamburek, Anchorage, for Appellee/Cross–Appellant.

Before MATTHEWS, Chief Justice, COMPTON, EASTAUGH, and BRYNER, Justices.

## OPINION

BRYNER, Justice.

### I. INTRODUCTION

An accident aboard a fishing vessel in the Bering Sea provoked a decade-long dispute between the vessel's owner and its insurers. The case raises two significant questions concerning an insurer's duties toward its insured: Upon discovering potential reasons to deny coverage, must an insurer promptly inform its insured of the problems? And does the insurer estop itself from denying

coverage if it breaches this duty by withholding notice to its insured while it investigates its coverage defenses? The superior court answered "yes" to both questions. Because we agree that the insurer in this case had a duty to give prompt notice and because the record supports the court's findings of breach, prejudice, and resulting estoppel, we affirm.

## II. FACTS AND PROCEEDINGS

When we first considered this case four years ago, we detailed the events and proceedings that brought it before us.[1] We summarize that history here and then update it.

In March 1986 Christopher Fulton fell and injured himself on board the fishing vessel JAMIE LYNN in the Bering Sea southeast of the Pribilof Islands. Christopher Clark was in command of the JAMIE LYNN when the accident occurred. Christopher Clark's father, Walter Clark, owned the JAMIE LYNN and had a $500,000 protection and indemnity insurance policy on the vessel. Under the policy, Pacific Marine Insurance Company (PacMar) would cover the first $200,000 of any loss, and Lloyd's & Institute of London Underwriting Companies (Lloyds) would cover any additional loss up to the $500,000 limit. The policy's coverage was "confined to waters of Bristol Bay and waters surrounding the Alaska Peninsula, and connecting waters to Cordova."

Walter Clark notified his insurance agent of Fulton's injury in July 1986. PacMar received notice on August 4 and immediately recognized potential coverage problems, including the possibility that the vessel's location at the time of the accident was in an area of the Bering Sea that was beyond the imprecisely defined geographical coverage of the policy. By late August, PacMar decided to hire attorney Paul Daigle to handle all coverage defenses.

In early September, Daigle hired marine investigator George Barnum to investigate the claim. Meanwhile, the Clarks consulted attorney Michael Schneider about Fulton's potential claim against them. Also, in September, after Fulton had filed a complaint and moved to arrest the JAMIE LYNN, PacMar, at Walter Clark's request, hired attorney Robert Richmond to represent the Clarks in defending against Fulton's actions.

At about the same time—mid-September—Barnum carried out his coverage investigation. In the course of his investigation, Barnum interviewed both Walter and Christopher Clark, obtaining specific information from Christopher suggesting that the JAMIE LYNN had been outside the policy's geographical limits at the time of Fulton's accident. Barnum did not notify either of the Clarks' attorneys of these interviews; nor did he explain his purpose to the Clarks. Barnum reported the results of his investigation to PacMar, recommending that it defend the Clarks under a reservation of rights and challenge coverage in a federal declaratory judgment action. PacMar agreed and, on September 22, notified the Clarks by letter of its intent to reserve the right to dispute coverage. Until then, PacMar had given no notice to the Clarks or their attorneys of its coverage investigation.

The Clarks refused to agree to PacMar's proposed reservation of rights, but Richmond continued to represent them at PacMar's expense. The Clarks eventually resolved their dispute with Fulton by confessing judgment for $450,000 and assigning Fulton their right to proceed against their insurers. In exchange, Fulton promised not to execute against them.

In 1992, proceeding under the Clarks' assignment, Fulton filed suit against PacMar's co-insurer, Lloyds, asserting the Clarks' rights to coverage under the JAMIE LYNN's policy.[2] Fulton alleged that PacMar had acted in bad faith by conducting its

---

1. See Fulton v. Lloyds & Inst. of London Underwriting Cos., 903 P.2d 1062, 1063–65 (Alaska 1995) (quoting extensively from the superior court's initial findings).

2. By 1992 PacMar had been declared insolvent and had ceased doing business. Fulton's suit also named Property Marine—the company that had arranged the co-coverage by PacMar and Lloyds—as a defendant. Property Marine apparently had ceased doing business, and it never filed an appearance in the action.

coverage investigation without first informing the Clarks and that Lloyds, as PacMar's co-insurer, was estopped from denying coverage.

Following trial, the superior court found that the JAMIE LYNN had been outside the policy's geographical coverage when Fulton's accident occurred, that this was a material policy breach, and that the policy therefore did not cover the accident. Construing the terms of the policy, the court ruled that no agency relationship existed between Lloyds and PacMar. The court concluded that without an agency relationship, PacMar's conduct could not bind Lloyds. Declaring that Lloyds had a valid defense to coverage even if PacMar might be estopped by its own conduct from denying coverage, the court entered judgment for Lloyds without addressing Fulton's claim of estoppel.

Fulton appealed.[3] In *Fulton v. Lloyds,* we upheld the superior court's findings that the accident occurred outside the area covered by the JAMIE LYNN's insurance policy and that the vessel's presence outside the covered area amounted to a material policy breach.[4] But we rejected the superior court's interpretation of the policy's terms governing the relationship between PacMar and Lloyds.[5] We construed the policy to require that Pac-Mar and Lloyds be treated as a single party for purposes of estoppel, reasoning that the policy should allow "only one defense ...,  since there was only one policy."[6] We thus remanded for consideration of Fulton's estoppel claim, directing the lower court to determine "whether there were material breaches of any defense duties under the policy."[7]

On remand, the superior court made detailed findings concerning PacMar's conduct from the time it initially learned of Fulton's accident to the time it sent the Clarks its reservation of rights letter. Based on these findings, the court entered conclusions of law resolving Fulton's claims.

The court began by rejecting Fulton's contention that PacMar breached its duty of defending the Clarks by conducting a conditional defense and simultaneously denying coverage in a federal declaratory judgment action. Although the court acknowledged that PacMar had a duty to provide independent counsel once the Clarks rejected Pac-Mar's reservation of rights letter,[8] it decided that PacMar met this duty by providing Walter Clark with an attorney of his choice—Robert Richmond—who, in the court's view, acted independently on the Clarks' behalf. For this reason, the court concluded that the defense PacMar provided was not "conditional."

The court next considered Fulton's argument that PacMar breached the insurance policy by conducting its coverage investigation and developing its coverage defenses before sending the Clarks its reservation of rights letter. Noting that PacMar became aware of its potential coverage defenses in early August 1986, the court faulted the company for failing to notify the Clarks of these defenses until late September, when it sent them its reservation of rights letter:

> Instead of taking immediate action to reserve its rights and put the Clarks on full notice of the coverage problem, [PacMar's] counsel began an investigation of the coverage question.
>
> ... Even after being informed that the Clarks had retained their own counsel, Michael Schneider, [PacMar] did not call off its interviews, nor did it warn the Clarks of the purpose of the interviews. [PacMar] did not even notify the attorney which it had retained for the Clarks, Robert Richmond.
>
> ... These actions allowed [PacMar] to build its case against the Clarks before fully disclosing to them the nature of the coverage dispute and their rights under Alaska law.

---

3. See *Fulton,* 903 P.2d at 1062.

4. See *id.* at 1066 n. 3.

5. See *id.* at 1067–70.

6. *Id.* at 1069.

7. *Id.* at 1070.

8. See *CHI of Alaska, Inc. v. Employers Reinsurance Corp.,* 844 P.2d 1113, 1117–19 (Alaska 1993).

The court thus concluded that PacMar had committed two distinct violations, the first contractual and the second sounding in tort.

Regarding the contractual violation, the court cited the general rule that when a liability insurer identifies a potential conflict, it "should promptly take steps to ensure that the insured is made fully aware of and understands the problem." [9] The court further observed that an insurer must communicate its intent to deny coverage in time to protect its insured's interests.[10] The court reasoned that "[t]he same is true of an insurer's decision to reserve its rights to contest coverage: the insured must be allowed the chance to protect her own interests." The court thus concluded that once PacMar had reason to believe that a coverage dispute existed, it owed a duty to "tak[e] immediate action to reserve its rights and put the Clarks on full notice of the coverage problem...." The court ruled that, until PacMar had given this notice, it could not proceed with its coverage investigation.

The court went on to find that PacMar's actions presumptively prejudiced the Clarks.[11] In addition, pointing to factual disputes over issues such as whether the JA-MIE LYNN was actually outside the policy's geographical coverage at the time of the accident, the court found that PacMar had actually prejudiced the Clarks by interviewing them about coverage outside their counsel's presence and without fully informing them of their rights.

Finding that the Clarks had "relied to their detriment on [PacMar's] actions," the court concluded: "As a result, PacMar would have been estopped from denying coverage of Fulton's claim. As the Supreme Court indicated in *Fulton*, Lloyds is estopped to the same extent as [PacMar]."

Upon concluding that PacMar had breached its contractual obligation to give the Clarks prompt notice of the coverage problems, the court separately addressed PacMar's duty under the implied covenant of good faith and fair dealing,[12] finding that PacMar had breached the implied covenant by treating the Clarks unfairly:

> It was fundamentally unfair for [PacMar] to continue to build its case for denying coverage without first obtaining a reservation of rights from the Clarks. It was also unfair for [PacMar] to interview the Clarks without counsel present, even after Walter Clark informed [PacMar] that he had an attorney.

While the court characterized PacMar's failure to give prompt notice as a contractual breach that would have resulted in Lloyds paying only contract damages—that is, damages not exceeding Lloyds's $300,000 share of the $500,000 policy limits—it characterized the implied-covenant breach as sounding in tort, thereby rendering Lloyds fully liable for Fulton's judgment against the Clarks.[13] After awarding Fulton costs, attorney's fees, and prejudgment interest, the superior court entered a final judgment against Lloyds totaling $763,290.42.

Lloyds appeals; Fulton cross-appeals.

## III. DISCUSSION

Lloyds contends that the court erred in ruling that PacMar should have suspended its investigation merely because it had "reason to believe" that there might be a coverage dispute. Lloyds further contends that, even if PacMar should have notified the Clarks before investigating coverage, its failure to do so did not warrant imposing coverage by estoppel. In turn, Fulton challenges the award of prejudgment interest and conditionally disputes the court's conclusion that

---

**9.** Quoting Robert Keeton & Alan Widiss, *Insurance Law* § 7.6(b), at 823 (1988) (internal quotations omitted).

**10.** *See Sauer v. Home Indem. Co.*, 841 P.2d 176, 182 (Alaska 1992) (citing 7C John A. Appleman, *Insurance Law and Practice* § 4686 (1979)).

**11.** In support of its presumptive prejudice finding, the court cited *CHI of Alaska, Inc.*, 844 P.2d

at 1119; *Sauer*, 841 P.2d at 182, 183; and *Continental Insurance Co. v. Bayless & Roberts, Inc.*, 608 P.2d 281, 291 (Alaska 1980).

**12.** *See State Farm Fire & Cas. Co. v. Nicholson*, 777 P.2d 1152 (Alaska 1989); William Shernoff, *Insurance Bad Faith Litigation* § 1.07[2] at 1–23 (1993 ed.).

**13.** *See Nicholson*, 777 P.2d at 1156.

Richmond provided the Clarks with independent representation. We begin with Lloyds's appeal and then consider Fulton's cross-appeal.

### A. *Lloyds's Appeal*

#### 1. *Standards of review*

This court defers to the superior court's factual findings, reviewing them only for clear error;[14] but in reviewing the superior court's application of legal doctrines, we apply our independent judgment.[15]

#### 2. *The superior court properly concluded that PacMar breached its duty of loyalty to the Clarks by conducting its coverage investigation before fully informing the Clarks of its potential coverage defenses.*

Lloyds contends that the superior court erred in holding that, once PacMar had "reason to believe" that a coverage dispute "may" exist, it should have suspended its investigation and then denied coverage, waived the coverage issue, or sought a reservation of rights. According to Lloyds, neither case law nor policy considerations support holding insurance companies to that standard of conduct. Specifically, Lloyds characterizes PacMar's actions as necessary investigation that an insurer must complete before deciding whether to reserve its rights. Lloyds insists that the court's prompt-notice requirement will discourage insurers from pursuing initial claims investigations with the diligence required of them by law. We disagree.

Our prior decisions support the superior court's ruling. In *Sauer v. Home Indemnity Co.*, we held that an insurer has a duty to give its insured prompt and full notice of its intention to deny coverage:

An insurer is required to give the insured "such notice of its intention to deny liability and of its refusal to defend as will give the insured a reasonable time to protect himself." Such notice must not only be prompt, but it must "provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim."[16]

This requirement of prompt and adequate notice arises from, and is integrally related to, an insurer's duty to defend. Timely notice "is essential so that the insured may promptly undertake its own defense";[17] notice thus protects the insured not only against third-party claims, but also against potentially conflicting interests of the insurer, which "might gain access to information, not otherwise properly available to it, which it could use to its advantage later to establish the insured's breach."[18]

Because notice of potential conflict enables insureds to protect themselves against their insurers, the duty to give this notice should not depend on the insurer's final decision on coverage. Rather, it should attach when an insurer has good reason to believe that a coverage dispute may exist. In our view, the superior court correctly recognized that "[w]hen a potential conflict is identified, 'a liability insurer should promptly take steps to ensure that the insured is made fully aware of and understands the problem.'"[19]

Lloyds argues, however, that applying this rule in the present case would make no sense because the trial court "held that [PacMar] did not breach any duty relating to the *defense* of Fulton's personal injury claim." But while the duty to give prompt notice is an aspect of the insurer's broader duty to defend its insured, this court has previously regarded the prompt-notice duty as indepen-

---

**14.** *See Tenala, Ltd. v. Fowler*, 921 P.2d 1114, 1118 (Alaska 1996).

**15.** *See State v. United Cook Inlet Drift Ass'n*, 895 P.2d 947, 950 (Alaska 1995).

**16.** 841 P.2d 176, 182 (Alaska 1992) (quoting 7C John A. Appleman, *Insurance Law and Practice* § 4686 (1979), and AS 21.36.125).

**17.** *Id.* at 183.

**18.** *Continental Ins. Co. v. Bayless & Roberts, Inc.*, 608 P.2d 281, 291 (Alaska 1980); *see also CHI of Alaska, Inc. v. Employers Reinsurance Corp.*, 844 P.2d 1113, 1116 (Alaska 1993).

**19.** Quoting Robert Keeton & Alan Widiss, *Insurance Law* § 7.6(b), at 823 (1988).

dently enforceable.[20]  Moreover, Lloyds is mistaken in characterizing the superior court as having expressly held that PacMar "breached no defense duties" by pursuing its coverage investigation.  The court did find that PacMar complied with its duty to defend the Clarks by providing them with Richmond's independent representation.  But it carefully limited this finding to the period after PacMar sent the Clarks its reservation of rights letter and initiated its federal declaratory judgment action—in other words, the period after PacMar completed its undisclosed coverage investigation.[21]

Hence, the court did not declare, as Lloyds suggests it did, that PacMar's coverage investigation never adversely affected the Clarks' right to receive a conflict-free defense.  To the contrary, in concluding that the investigation caused the Clarks actual prejudice by precluding their attorney from participating during Barnum's interview about coverage, the superior court implicitly determined that PacMar had in fact impaired the Clarks' right to a conflict-free defense.

Lloyds also maintains that requiring insurers to give notice as soon as they have reason to believe that a coverage dispute might exist amounts to a "shoot first, ask questions later" policy.  According to Lloyds, adopting such a policy would undermine the insurer's duty to conduct prompt claims investigations and would inevitably result in "a flurry of premature, unsupported and improper 'reservation of rights' letters any time an insurer 'suspects' a coverage problem...."

Lloyds's argument is unpersuasive. Lloyds posits that an insurer cannot give notice of potential coverage problems or propose to defend its insured under a reservation of rights before conducting a coverage investigation.  But it cites no legal support for this premise, which the superior court implicitly rejected by holding PacMar to a duty of prompt notice.  Sound authority supports the superior court's decision:

> Once the insurer has a reason to believe ... that there are coverage issues, it should not continue to obtain information from the insured that the insured is not obligated to provide pursuant to his or her duty to cooperate without first notifying the insured of the potential coverage problems.  Until such notice has been given, the insured will be neither obligated nor in a position to look after his or her own interests....  [T]o allow the insurer to attempt to obtain information from the insured in order to bolster an undisclosed policy defense would, in effect, allow the company to take advantage of its fiduciary relationship with the insured in order to strengthen its position against the insured.[22]

Lloyds nevertheless asserts that it is unrealistic to expect that PacMar could have decided whether to proceed under a reservation of rights "until Barnum completed his investigation of the facts and circumstances surrounding Fulton's claim."  Lloyds also asserts that requiring PacMar to give the Clarks immediate notice would have interfered with its duty to conduct a prompt claim investigation—in Lloyds's words, its duty "to 'jump in with both feet' once a notice of claim is received."

But the facts belie these assertions.  PacMar adjustor Kristy Bottomley first learned of potential coverage defenses in early August 1986.  Almost immediately, Bottomley called Christopher Clark, telling him that coverage. could be a problem and that the

---

20.  *See, e.g., Sauer,* 841 P.2d at 182 ("[The insurer] not only breached its duty to defend, but it failed to promptly communicate its denial of a defense and coverage or any basis for such denial."); *Continental,* 608 P.2d at 292 (Alaska 1980) (holding that insurer's failure to inform insured promptly of its intention to deny liability after discovering facts evidencing a breach of the insurance policy amounts to a waiver of its right to deny coverage based on that breach).

21.  The superior court stated in paragraph 4 of its conclusions of law on remand:

> [PacMar] did not breach a duty of care to the Clarks by conducting a conditional defense *while maintaining the declaratory judgment action.*  [PacMar] supplied the Clarks with independent counsel, *while [PacMar] pursued the policy coverage dispute.*  The defense provided was thus not "conditional."

(Emphases added;  citation omitted.)

22.  1 Allan D. Windt, *Insurance Claims and Disputes,* § 2.06, at 39 (3d ed.1995).

policy required him to cooperate with her. Clark answered Bottomley's questions, many of which related to whether the policy had been breached at the time of Fulton's injury. Specifically Clark told her that the vessel was fifteen to sixteen hours from the Pribilof Islands.

By August 20 Bottomley had drafted a reservation of rights letter, which listed as an alleged policy breach that the JAMIE LYNN had been outside the geographical limits of coverage. Bottomley never sent this letter, evidently because it required approval by PacMar's Large Loss Committee. But later in August the Large Loss Committee met and formally decided both to draft the Clarks a new reservation of rights letter and to hire an attorney to handle its coverage defenses.

By September 4 PacMar had hired Daigle as its coverage counsel; he promptly launched a coverage investigation, using his marine investigator, Barnum. Without informing the Clarks' attorney or disclosing his purpose, Barnum interviewed the Clarks and JAMIE LYNN crew members from September 12th through the 15th. On the 15th, Barnum reported the results of these interviews to PacMar. PacMar failed to inform the Clarks and their attorneys of the coverage problems and of its investigation until several days later, when it sent its September 22 reservation of rights letter.

■ These events refute Lloyds's assertion that, before September 22, PacMar lacked sufficient information to notify the Clarks of their coverage problems. Although PacMar did not commit its course before the end of September, it was already unmistakably steering toward denial of coverage a month earlier, in late August. The knowledge it had acquired by then had prompted it to draft two reservation of rights letters and to launch a full-blown coverage investigation. Lloyds cannot plausibly maintain that the information that caused PacMar to take these actions was too flimsy to place its interests in conflict with the Clarks' or too vague to warrant immediate notice.

Nor can Lloyds plausibly maintain that giving immediate notice would have impeded PacMar in fulfilling its obligation to "jump with both feet" into its claim investigation. PacMar referred the issue of coverage to Daigle. Acting as PacMar's "outside coverage counsel," Daigle hired Barnum, who jumped with both feet into an investigation of coverage defenses *against* the Clarks. While immediate notice undeniably might have delayed PacMar's "outside" coverage investigation against the Clarks, the record fails to show that this delay would have impaired the investigation PacMar was required to pursue on their behalf—an "inside" claim investigation.

Lloyds concedes that "once a liability insurer has a proper basis for issuing a reservation of rights letter, the interests of the insured and insurer are ... in such conflict that the insurer should cease gathering information from the insured through informal investigative means, absent the insured's express consent." Our review of the record persuades us that the evidence supports the superior court's finding that PacMar had a proper basis to give the Clarks notice by the time it hired Daigle to develop its coverage case.

3. *The superior court did not err in concluding that PacMar's conduct estopped it from denying coverage.*

Lloyds claims that even if the initial information PacMar acquired should have prompted it to suspend its investigation and notify the Clarks of the potential coverage issues, the superior court erred in applying coverage by estoppel as the remedy for PacMar's inaction.

■ Lloyds begins by challenging the court's findings of presumed and actual prejudice. It asserts that the cases the superior court relied on in finding presumptive prejudice—*CHI of Alaska, Inc. v. Employers Reinsurance Corp.,*[23] *Sauer v. Home Indemnity Co.,*[24] and *Continental Insurance Co. v. Bayless & Roberts, Inc.*[25]—are inapposite. Lloyds further argues that presuming preju-

**23.** 844 P.2d 1113 (Alaska 1993).

**24.** 841 P.2d 176 (Alaska 1992).

**25.** 608 P.2d 281, 291 (Alaska 1980).

dice is unjustified here because the Clarks received an independent defense and the absence of coverage has clearly been established. In Lloyds's view, "this case does not present a circumstance warranting the application of the draconian rule of presumed prejudice. At most, Fulton is invoking technical, procedural deficiencies in [PacMar's] handling of the coverage investigation."

But Lloyds's view of the facts is self-serving and decidedly at odds with the darker view taken by the superior court, which found that PacMar "continued to investigate the coverage issue, covertly building its case against the Clarks[,] ... until after it had gained full access to the Clarks without the presence of counsel." Lloyds fails to establish that the trial court's view of the facts is clearly erroneous. And while it points to factual distinctions between the present case and the cases the trial court relied on to find presumptive prejudice, Lloyds offers no persuasive reason for any legal distinction.[26]

In arguing that presumptive prejudice is not legally appropriate, Lloyds relies chiefly on the Washington Court of Appeals' decision in *Coventry Associates, L.P. v. American States Insurance Co.*[27] But in an opinion issued after Lloyds filed its brief, the Washington Supreme Court reversed the court of appeals' ruling.[28] The more recent opinion in *Coventry* undermines Lloyds's position, strongly suggesting that Washington's supreme court would apply presumptive prejudice and coverage by estoppel to a claim like the Clarks', regardless of the existence of coverage.[29]

■ Moreover, Lloyds has not shown that the superior court was clearly erroneous in finding actual prejudice—a finding that effectively establishes Lloyds's failure to rebut the presumption of prejudice. Lloyds asserts that PacMar's coverage investigation could not have harmed the Clarks because the evidence conclusively demonstrates that the JAMIE LYNN was outside the area of the policy's coverage. Lloyds insists that "no 'dream team' of lawyers could have altered the outcome on that fatal point." But this outcome-based view of the prejudice requirement is unduly rigid. We have previously recognized that "[a]n insurer's obligation to defend and the obligation to indemnify are separate and distinct elements"[30] and that an "insurer may have an obligation to defend although it has no ultimate liability under the policy."[31] Thus, coverage is not the ultimate measure of prejudice; in order to establish prejudice, Fulton was required to show only that PacMar's conduct caused some actual

---

**26.** The most particularly applicable case is *Sauer,* where we held that a substantial breach by an insurer of its obligations under the policy precluded it from later arguing that coverage did not exist. *See* 841 P.2d at 183–84.

**27.** 86 Wash.App. 845, 939 P.2d 1245 (1997), *rev'd,* 136 Wash.2d 269, 961 P.2d 933 (1998).

**28.** *See Coventry Assocs. v. American States Ins. Co.,* 136 Wash.2d 269, 961 P.2d 933 (1998).

**29.** In *Coventry,* a contractor sued its insurer for bad faith failure to investigate the contractor's claim for construction damages caused by a mudslide. *See Coventry,* 961 P.2d at 934. By the time the case reached appeal, it was undisputed that the policy did not cover the damage. *See id.* at 935. The Washington Supreme Court had previously held in third-party cases—cases where the insured party asserts a third party's claim for damages—that a bad-faith action could be maintained under a theory of presumptive prejudice even when coverage was ultimately found nonexistent. *See id.* at 936–37. But the court of appeals in *Coventry* granted summary judgment to the insurer, declining to apply the same rule to a first-party case—a case like *Coventry's* where the insured directly asserts its own damages claim. *See id.* at 935–36. In reversing the court of appeals, the supreme court held that a bad-faith action is permissible against an insurer in a first-party case, as it is in a third-party case, "regardless of whether the insurer was ultimately correct in determining coverage did not exist." *Id.* at 937. But the court declined to apply presumptive prejudice to first-party cases, restricting its use to third-party cases. *See id.* at 938–39. In the absence of presumptive prejudice, the court also declined to apply the doctrine of coverage by estoppel, holding that if Coventry established bad faith at trial, its recovery should be limited to the actual expenses it incurred as a result of its insurer's conduct. *See id.* at 940. In contrast to *Coventry,* the present case involves a third-party claim.

**30.** *Sauer v. Home Indem. Co.,* 841 P.2d 176, 180 (Alaska 1992).

**31.** *Afcan v. Mutual Fire, Marine & Inland Ins. Co.,* 595 P.2d 638, 645 (Alaska 1979); *see also Sauer,* 841 P.2d at 180–81.

harm to the Clarks, not that it changed the outcome of the case.

Impropriety of the kind that PacMar committed is intolerable if it has any adverse effect on an insured party. The need to discourage such overreaching is particularly compelling in insurance cases because of the special fiduciary relationship that exists between an insurer and its insureds, the insurer's peculiar ability to take advantage of its insured's trust, and the typical insured's vulnerability to overreaching conduct.[32] Given the unique nature of this relationship, a bright-line, easily established test of prejudice also promotes efficiency and fairness. A stricter, outcome-based definition of prejudice would require case-by-case litigation to determine actual coverage—a requirement that would pit the insurer against its own insured on a playing field where the insurer almost always enjoys tremendous financial and institutional advantages.

Moreover, by punishing misconduct only if the insured can show that the misconduct defeated otherwise available coverage, an outcome-based prejudice test would effectively reward successful misconduct. It would encourage insurers to dispute coverage—and to overreach in the process to ensure that their efforts succeed. The strict prejudice requirement thus would functionally convert the remedy of coverage by estoppel into a remedy of coverage by proof of coverage; by requiring the insured to prove that the insurer's misconduct actually changed the outcome, it would effectively force the insured to shoulder the affirmative burden of proving coverage.

The dissent suggests that when an insurer's breach makes no difference in the ultimate outcome, or when it is not a fundamental breach, the remedy of coverage by estoppel should be abandoned in favor of some lesser punishment—one more suitable to the crime.[33] But applied to insurance contracts, a "punishment-fits-the-crime" approach would retain all of the drawbacks of an outcome-based prejudice rule without offering any offsetting advantages. It would

continue to encourage case-by-case litigation of coverage, to reward successful misconduct (albeit partially rather than fully), and to saddle the insured with the duty of proving either loss of coverage or some unspecified alternative form of actual damage. Moreover, the dissent proposes no specific sanction to replace estoppel. And we can think of none that would be workable—that is, easy to apply yet still capable of effectively deterring misconduct.

Furthermore, by contending that "[a]t most, Fulton is invoking technical, procedural deficiencies in [PacMar's] handling of the coverage investigation," Lloyds posits a distinction between serious and non-serious breaches that, in our view, is somewhat artificial. Lloyds repeatedly points to the trial court's finding that PacMar did not breach its duty of providing the Clarks with an independent defense. But as we have already pointed out, the trial court did not acquit PacMar of breaching its duty to defend the Clarks. Instead, the court confined its ruling on breach to the period after the covert investigation, finding that PacMar fulfilled its duty to defend "while maintaining the declaratory judgment action" and "while [it] pursued the policy coverage dispute." The careful wording of this finding implicitly determined that PacMar had impaired the Clarks' right to a conflict-free defense at an earlier stage of the process by precluding their attorney from participating during Barnum's interview about coverage.

Indeed, the superior court based its finding of actual prejudice precisely on this impairment of the Clarks' right to a conflict-free defense:

> As the record indicates, there was in fact dispute over the exact location of the JAMIE LYNN.... It is difficult to ascertain with precision the extent to which the intervention of competent legal counsel could have helped the Clarks develop a more favorable factual record. The Clarks were prejudiced by [PacMar's] access to them without full disclosure of their rights or the presence of counsel.

---

32. *See, e.g., State Farm Fire & Cas. Co. v. Nicholson,* 777 P.2d 1152, 1157 (Alaska 1989).

33. Dissent at 1215.

This finding is not clearly erroneous. Having received no notice of PacMar's coverage investigation, the Clarks submitted to Barnum's interviews without the benefit of legal representation. In the course of these interviews, they gave Barnum damaging information concerning their claim—information that potentially could have helped PacMar build a case against them on coverage. This in itself is substantial evidence of harm, establishing that the trial court did not clearly err in finding that PacMar's conduct actually prejudiced the Clarks.

Lloyds nonetheless contends that the court erred in finding prejudice because the information Barnum obtained from the Clarks was not actually used against them. Rather, according to Lloyds, evidence from independent sources was sufficient to prove the Clarks were not covered. Lloyds maintains that in these circumstances we should apply an "independent source" rule comparable to the exception that criminal courts apply to avoid suppression of evidence under the exclusionary rule.[34]

To support its position, Lloyds cites an Indiana appellate decision, *Snodgrass v. Baize*.[35] Analogizing insurance cases to criminal cases, *Snodgrass* found exclusion, not estoppel, to be the correct remedy when an insurer improperly obtains evidence against its clients.[36] But we find the analogy to criminal cases unwarranted. In our view, rules governing suppression of evidence in criminal cases are inapposite in the context of insurance disputes because suppression of evidence in the criminal-law context implicates public-welfare concerns that have little relevance in the unique contractual setting of insurance law. Moreover, police deal with criminals at arm's length, whereas insurers

have a special fiduciary relationship with their clients—a relationship in which the "adhesionary aspects of insurance contracts make the insured particularly reliant on the insurer's good conduct."[37] In this setting, public policy strongly favors rules providing "needed incentive to insurers to honor their implied covenant [of good faith] to their insureds."[38]

█ While some form of sanction more lenient than estoppel might be desirable for breaches involving equally situated parties engaged in arms-length business transactions, given the size and pervasiveness of the insurance industry, its economic strength, and the fiduciary duty of loyalty it owes to its clients, we conclude that an insurer's breach of the duty to defend must be considered a material breach that estops denial of coverage unless the breach clearly has no adverse impact on the relationship between the insurer and the insured. Here, although the consequences of PacMar's breach were not outcome-determinative, they did adversely affect the Clarks and were therefore prejudicial.

In sum, the superior court did not err in concluding that PacMar's conduct estopped it from denying coverage. Under our prior decision in *Fulton*, the court correctly determined that PacMar's estoppel runs against Lloyds.[39] Accordingly, we affirm the superior court's entry of judgment against Lloyds.[40]

## B. *Fulton's Cross–Appeal*

### 1. *Standard of review*

Fulton argues in his cross-appeal that the superior court erred in calculating prejudgment interest on his award against Lloyds.[41]

---

**34.** *See, e.g., Smith v. State,* 948 P.2d 473 (Alaska 1997).

**35.** 405 N.E.2d 48, 54 (Ind.App.1980).

**36.** *See id.*

**37.** *State Farm Fire & Cas. Co. v. Nicholson,* 777 P.2d 1152, 1157 (Alaska 1989).

**38.** *Id.*

**39.** *See Fulton v. Lloyds & Inst. of London,* 903 P.2d 1062, 1069 (Alaska 1995).

**40.** Lloyds does not specifically dispute the superior court's conclusion that PacMar's conduct amounted to a breach of the covenant of good faith and fair dealing and that this breach entitled Fulton to damages in tort, as well as to contract damages. Lloyds also does not dispute the court's ruling concerning the proper measure of damages that applies under this tort theory. We therefore need not address these issues.

**41.** Given our decision affirming the superior court's entry of judgment against Lloyds, we need not address Fulton's contingent cross-ap-

He advances a twofold argument. The first part is based on AS 09.30.070(b), which governs accrual of prejudgment interest in personal injury cases; the second is based on Alaska Civil Rule 68(b)(2), which governs offers of judgment. These issues present questions of law, which we review de novo.[42]

2. *Prejudgment interest should have begun to accrue on September 26, 1986, rather than beginning April 22, 1992.*

Fulton argues that the superior court erred in determining that prejudgment interest should accrue from April 22, 1992, the day that the defendants received formal notice of Fulton's suit. In fixing the starting date for its award of prejudgment interest, the court cited AS 09.30.070, which governs accrual in cases involving personal injury, death, or property damage. This statute provides, in relevant part:

> Except when the court finds that the parties have agreed otherwise, prejudgment interest accrues from the day process is served on the defendant or the day the defendant received written notification that an injury has occurred and that a claim may be brought against the defendant for that injury, whichever is earlier.[43]

Fulton claims that under this provision, prejudgment interest should begin to accrue from September 22, 1986, when Walter Clark sent a letter imploring the Clarks' attorney, Richmond, to "tell us immediately and in writing as to whether or not the insurance companies have agreed to cover this incident." Richmond forwarded this letter to PacMar; it is not clear exactly when.

■ But in any event, Clark also sent a copy of his September 22 letter to Lloyds's agent in San Francisco, Property Marine, Inc.; Property Marine received the letter and forwarded it to Lloyds's agent in London by fax on September 26. Property Marine's cover memo, prominently stamped "CLAIM," notified Lloyds that "this is your first notice of a back injury to crewman Christopher Fulton. The injury occurred on March 9, 1986, but primary underwriters were not placed on notice until August, 1986." The memo named all of the attorneys participating in the matter, specifically indicating that PacMar's attorney "will be seeking a declaratory relief judgement from the court based on the numerous warranties that were breached." It further advised, "I feel London underwriters must respond to the letter from assured," and "IT WOULD NOT BE A BAD IDEA FOR EXCESS UNDERWRITERS TO JOIN PRIMARY UNDERWRITER IN THE DECLARATORY RELIEF ACTION."

In our view, receipt of a copy of this letter by Lloyds's agent on September 26, 1986, satisfied the notice requirement of AS 09.30.070(b). In choosing the date of actual notice of Fulton's complaint as the starting point for prejudgment interest, the trial court evidently construed this statute's reference to "notification" of "a claim" as a requirement that Lloyds receive notice of Fulton's suit against the insurers. But Fulton simply asserted the Clarks' assigned cause of action, and stood in their shoes. The relevant "claim" for purposes of the prejudgment interest provision, then, is the Clarks' claim under their policy. Moreover, AS 09.30.070(b) does not require direct notice from the prospective claimant. Rather, the statute establishes an objective test providing that interest begins to accrue upon written notice "that would lead a prudent person to believe that a claim will be made against the person receiving the notification."[44]

Thus, the only relevant question is whether a reasonable person in Lloyds's position

---

peal arguments concerning the independence of Richmond's legal representation.

**42.** *See McConkey v. Hart,* 930 P.2d 402, 404 (Alaska 1996), as modified on denial of rehearing (February 2, 1997).

**43.** AS 09.30.070(b). Although the superior court initially questioned whether AS 09.30.070(b) applied to Fulton's action against Lloyds, neither party claims on appeal that the court erred in

ultimately concluding that it did. Because the issue is not raised, we need not decide it.

**44.** *See Himschoot v. Shanley,* 908 P.2d 1035, 1042–43 (Alaska 1996). Nor is it significant that Clark addressed his letter to his primary insurer, PacMar; for as we recognized in our original opinion, the terms of the policy require PacMar and Lloyds to be treated as a single party and allow "only one defense . . ., since there was only one policy." *Fulton v. Lloyds & Inst. of London*

would believe, upon receiving Walter Clark's September 22 letter and Property Marine's accompanying memo, that the Clarks would claim policy coverage for Fulton's injuries.[45] Our review of the letter and the cover memo leads us to answer this question in the affirmative. Accordingly, we hold that AS 09.30.070(b) entitles Fulton to prejudgment interest as of September 26, 1986—the earliest date that the record establishes for receipt of Clark's letter by either PacMar or Lloyds. We therefore vacate the portion of the judgment setting April 22, 1992, as the accrual date and remand for recalculation based on Lloyds's receipt of the 1986 correspondence.

3. *The changed date of accrual for prejudgment interest requires recomputation of the value of Fulton's award in comparison to his second offer of judgment.*

Fulton argues next that the superior court erred in failing to award him an enhanced rate of prejudgment interest based upon his 1993 and 1997 offers of judgment. Alaska Civil Rule 68(b)(2) provides that if the final judgment is less favorable to the defendant than a pretrial offer of judgment by the plaintiff, the plaintiff is entitled to an increased rate of prejudgment interest.[46]

▮▮▮ We conclude that the superior court correctly found that Fulton's 1993 offer

of judgment was invalid because it was a joint offer to Lloyds and Property Marine.[47] We also conclude that in comparing the values of Fulton's 1997 offer and his final judgment, the superior court properly applied the formula that we adopted in *Farnsworth v. Steiner.*[48] Contrary to Fulton's argument, the *Farnsworth* formula is not limited to offers made by defendants.[49]

Fulton may nonetheless be entitled to enhanced interest on remand. Our holding that Fulton's prejudgment interest should accrue from September 1986 will increase the value of his final judgment under *Farnsworth.* Because this change may alter the Civil Rule 68 comparison, the trial court should reconsider this issue after recalculating Fulton's prejudgment interest based on the September 1986 accrual date.

## IV.  CONCLUSION

For the foregoing reasons, we AFFIRM the superior court's findings and conclusions on remand and its final judgment except insofar as the judgment establishes prejudgment interest. We VACATE the portion of the final judgment establishing prejudgment interest and REMAND for recalculation as directed in this opinion.

EASTAUGH, Justice, dissenting.

Although I agree that the insurers breached duties they owed their insureds, the

---

Underwriting Cos., 903 P.2d 1062, 1069 (Alaska 1995).

**45.**  *See Himschoot,* 908 P.2d at 1042–43.

**46.**  Alaska Civil Rule 68(b)(2) provides:
(b) If the judgment finally rendered by the court is not more favorable to the offeree than the offer, the prejudgment interest accrued up to the date of judgment is entered shall be adjusted as follows:
. . . .
(2) if the offeree is the party defending against the claim, the interest rate will be increased by the amount specified in AS 09.30.065.
AS 09.30.065 was amended substantially in 1997; however, the amended section only applies to causes of action "accruing on or after August 7, 1997." Ch. 26, § 55, SLA 1997. Under the version of AS 09.30.065 applicable in this case, Fulton's annual rate of interest would increase from 10.5% to 15.5%. *See Alaska Housing*

Finance Corp. v. Salvucci, 950 P.2d 1116, 1126 (Alaska 1997).

**47.**  *Cf. Hayes v. Xerox Corp.,* 718 P.2d 929, 936–37 (Alaska 1986); *Brinkerhoff v. Swearingen Aviation Corp.,* 663 P.2d 937, 943 (Alaska 1983).

**48.**  601 P.2d 266, 269 n. 4 (Alaska 1979). *Farnsworth* holds that in computing the value of a judgment under Civil Rule 68, the jury's damage award must be added to prejudgment interest accruing prior to the offer, pre-offer attorney's fees, and costs. *See id. Farnsworth* also holds that in determining attorney's fees for purposes of the Civil Rule 68 calculation, the trial court should refer to the partially contested fee schedule set forth in Civil Rule 82. *See id.*

**49.**  *See Power Constructors, Inc. v. Taylor & Hintze,* 960 P.2d 20, 34–36 (Alaska 1998) (applying the *Farnsworth* formula to both parties in considering competing offers of judgment).

Clarks, I disagree with this court's analysis of the effects of those breaches.

The superior court originally found that the insureds breached the navigational warranty. It based this conclusion on its findings that the JAMIE LYNN was in the Bering Sea near the Pribilof Islands, not Bristol Bay or the waters surrounding the Alaska Peninsula, and was therefore outside the geographical area covered by the policy. The superior court recited substantial, indeed overwhelming, evidence in support.[1] The only dispute about the vessel's location concerned its exact position in the Bering Sea, not whether it was within the area covered by the insurance policy. The superior court also found this breach by the Clarks to be material because it significantly increased the risk plaintiff Fulton would be injured.

But the superior court later equitably estopped the insurers from raising the breach of the navigational warranty. It did so because it found that the insurers had breached duties they owed the insureds, the Clarks, by interviewing them without first informing them of potential coverage issues (particularly the question of whether the vessel had been outside covered waters) when they did not have counsel present.

Prejudice is an essential element of equitable estoppel.[2] To satisfy that element, the superior court first presumed that the breach prejudiced the Clarks; it cited three decisions as authority for adopting that presumption.[3] The superior court also found that the interviews "actually prejudiced" the Clarks. In that regard, it stated that

> As the record indicates, there was in fact dispute over the exact location of the JAMIE LYNN ... It is difficult to ascertain with precision the extent to which the in-

tervention of competent legal counsel could have helped the Clarks develop a more favorable factual record. The Clarks were prejudiced by [the insurers'] access to them without full disclosure of their rights or the presence of counsel.

It did not discuss any other circumstances supporting its finding of actual prejudice.

Affirming, this court first holds that the superior court did not err in finding that the insurers breached duties to the insureds. I agree with that holding.

This court next holds that it was not error to equitably estop the insurers from relying on the Clarks' alleged breach of the navigational warranty.[4] I disagree with that holding.

In discussing estoppel's essential element of prejudice, this court first concludes that prejudice is to be presumed.[5] It alternatively holds that the superior court did not clearly err in finding that the insurers' breach actually prejudiced the Clarks.[6] Although the court does not expressly say so, it necessarily must reason that actual prejudice was established conclusively by the fact the insurers interviewed the Clarks when they had no attorney present and before notifying them that the insurers were looking into coverage.[7] This latter conclusion effectively rejects as irrelevant any evidence that the prejudice the Clarks suffered at the interviews was purely transitory and did not actually affect the outcome of the critical factual dispute: whether the vessel was in covered waters.

Applying the clear error standard of review[8] compounds the problem by ignoring the question, reviewed under an abuse of discretion or independent judgment stan-

---

1. United States District Court Judge James M. Fitzgerald also made findings of fact in the federal declaratory judgment proceeding that found that the JAMIE LYNN was outside covered waters.

2. *See Miscovich v. Tryck,* 875 P.2d 1293, 1302 (Alaska 1994); *Dressel v. Weeks,* 779 P.2d 324, 329 (Alaska 1989).

3. The superior court cited *CHI of Alaska, Inc. v. Employers Reinsurance Corp.,* 844 P.2d 1113, 1119 (Alaska 1993); *Sauer v. Home Indemnity*

*Co.,* 841 P.2d 176, 182–83 (Alaska 1992); and *Continental Insurance Co. v. Bayless & Roberts, Inc.,* 608 P.2d 281, 291 (Alaska 1980).

4. *See* Op. at 1209.

5. *See* Op. at 1206–1207.

6. *See* Op. at 1209.

7. *See* Op. at 1208.

8. *See* Op. at 1204.

dard, whether post-interview evidence is irrelevant to the issue of prejudice.

I would follow this analysis: (1) the insurers are equitably estopped from relying on a breach of the navigational warranty only if the insureds establish all essential elements of equitable estoppel; (2) prejudice is an essential element of equitable estoppel; (3) prejudice may not be conclusively presumed; (4) any possible presumption of prejudice [9] disappeared in this case when the insurers produced evidence, independent of any derived from the interviews, that the insureds breached the navigational warranty; and (5) even assuming all elements of equitable estoppel are present, the remedy should be commensurate with the prejudice suffered.

This approach is based on this assumption: in determining whether the insureds were prejudiced, and in selecting an appropriate remedy for the breach, the court must determine whether, and the extent to which, the insurers' breach actually hampered the insureds' ability to fairly dispute the vessel's location. The real coverage question is whether the vessel was in covered waters. The real estoppel question is whether the insurers' breach affected the outcome of the coverage issue. If the insurers' wrongful acts did not affect the outcome of the dispute about the vessel's location, there is no justification in law or fact for completely foreclosing the insurers from trying the navigational warranty issue by providing evidence of the vessel's location.

The superior court's equitable estoppel findings relied in part upon a presumption of prejudice. This court also presumes prejudice.[10] Most cases discussing a presumption

of prejudice concern breach of one of an insurer's primary duties, typically the duty to defend.[11] Not all duties and breaches are created equal.[12] But it is not necessary to decide whether the breaches here should give rise to a presumption of prejudice, because there was ample evidence that the vessel was not within covered waters. This evidence rebutted any presumption by establishing that the two interviews did not actually affect resolution of the factual dispute about where the vessel was.

And I also see no justification for adopting a conclusive and irrebuttable presumption of prejudice here. Nothing about the nature of the breaches here was so gravely inappropriate that we should prevent the insurers from attempting to rebut a presumption of prejudice.

I would therefore next have the court consider the alternative finding of "actual prejudice." In doing so, this court should apply its independent judgment because it is reviewing the superior court's implicit relevancy ruling when the superior court looked only to the interview events in deciding whether the Clarks were prejudiced. The superior court effectively ruled that the overwhelming evidence showing that the vessel was outside covered waters was irrelevant to the issue of prejudice, even though that evidence was not derived from the flawed interviews.

I think it was necessary to consider that evidence. It was relevant because it tended to show that the flawed interviews caused the Clarks no lasting prejudice or, indeed, any prejudice at all. The existence of that evidence and its subsequent preservation

9. For cases which presume prejudice to the insured where an insurer materially breaches the contract or acts in bad faith, *see Kirk v. Mount Airy Insurance Co.*, 134 Wash.2d 558, 951 P.2d 1124, 1126–27 (1998); and *Safeco Insurance Co. v. Butler*, 118 Wash.2d 383, 823 P.2d 499, 504 (1992). Both of these cases, however, recognized a rebuttable rather than a conclusive presumption. I do not read the three cases noted above in footnote 3 to discuss, much less endorse, a presumption of prejudice.

10. *See* Op. at 1206–1209.

11. *See, e.g., Safeco*, 823 P.2d at 504 (listing cases presuming prejudice where insurer had assumed

defense of action and later attempted to withdraw).

12. *See, e.g., Luke v. American Family Mut. Ins. Co.*, 476 F.2d 1015, 1020 (8th Cir.1972) (noting difference between liability of insurer which meets its duty to defend insured but fails to exercise good faith in settling within policy limits, and insurer which breaches its contract by failing to defend and then rejects reasonable settlement offer); *Montrose Chem. Corp. v. Superior Court*, 6 Cal.4th 287, 24 Cal.Rptr.2d 467, 861 P.2d 1153, 1157 (1993) (discussing differences between insurer's duties to defend and to indemnify).

through depositions rebuts any notion that the flawed interviews materially prejudiced the Clarks. Independent sources establishing the vessel's location rendered immaterial any prejudice resulting from any admissions the Clarks made during the interviews.

Nor can I imagine how this independent evidence of the vessel's true location might have remained unknown to the insurers had the interviews not been flawed. Assume the insurers had notified the Clarks of the coverage issue and interviewed the Clarks while they had counsel present. What could the Clarks or their counsel have done that would have favorably affected resolution of the location issue?

Refusing to attend the interviews or to answer questions about location would have been unavailing. The Clarks' contractual duty to cooperate would have foreclosed that course.[13] And if the Clarks had followed that approach, the insurers could have investigated further and learned that the vessel was not in covered waters. Because refusing to be interviewed would have gained them nothing, the Clarks were not prejudiced by the loss of any opportunity to follow such a course.

They alternatively might have professed ignorance, or claimed faulty memories. But that would have gained them nothing, because it would not have prevented the insurers from investigating and discovering the relevant facts from other sources. Loss of the opportunity to follow this course did not prejudice the Clarks.

They might alternatively have asserted that the vessel was in covered waters. This alternative was open to them only if they told what they believed to be the truth.[14] Because there is no indication that the insurers kept them from telling the truth at the interviews, it is hard to see how the breaches harmed them. Moreover, when counsel represented them in later proceedings, both Clarks gave deposition testimony indicating that the vessel was outside covered waters.[15] This testimony would have negated any self-serving statements they might have made at the interviews. And the other evidence would have overwhelmingly rebutted such statements.

Perhaps counsel could have prompted the Clarks to truthfully recount additional details favorable to coverage. But nothing kept them from recounting those details later. And again, the evidence of the actual location was overwhelmingly contrary to coverage.

We can assume that the Clarks were prejudiced if they did things during the interviews that later hampered them in litigating the vessel's true location. I would not find that they were hampered if they inevitably would have lost because there was no genuine dispute about the vessel's location. But if they made harmful admissions that, for valid reasons, they could have avoided but for the insurers' breaches,[16] lasting prejudice could have been avoided by preventing the insurers from relying on the admissions and their fruits.[17] The remedy for that prejudice was not to completely estop the insurers from relying on the navigational warranty and to prevent them from proving its breach by

**13.** The cooperation clause reads in pertinent part:

The Insured shall render every assistance to Underwriters hereof to facilitate investigation or adjustment of claims . . . and to co-operate [sic] fully in the securing of evidence. . . .

**14.** We must presume that they would not have knowingly falsified their answers on this issue, because doing so would have both precluded granting them equitable relief, and would have violated their contractual duty to cooperate. We must also conclusively presume that counsel would not have encouraged them or knowingly permitted them to falsify their answers.

**15.** In his deposition in the federal civil personal injury action, Chris Fulton again indicated that the JAMIE LYNN was sixteen hours outside the

Pribilof Islands at the time of Fulton's injury. Likewise, Walter Clark, in his November 18, 1986, deposition in the federal declaratory judgment action, testified that the JAMIE LYNN was fifty miles off the Pribilof Islands at the time of Fulton's injury.

**16.** Falsification or refusal to answer relevant questions would not have been a valid form of avoidance.

**17.** Cf. Snodgrass v. Baize, 405 N.E.2d 48, 54 (Ind.App.1980) (applying exclusionary remedy instead of estopping insurer from relying on policy defense).

independent evidence, but to restore the insureds to the position they would have occupied absent the insurers' breaches.

The court concludes that it is unfair to make these insureds prove the essential estoppel element of prejudice.[18] Assuming the court's fairness concerns are not remedied by adopting a presumption of prejudice, it should be sufficient to shift the burden to the insurers to prove lack of prejudice. Instead, the court creates a conclusive presumption of prejudice, and renders that presumption irrebuttable by preventing the insurers from disputing this essential element of estoppel: I see no justification for making this presumption irrebuttable.

Thus, I think it is legally incorrect to assume that the only evidence relevant to prejudice concerns the interview events. Alternatively, I think it was clear error to find prejudice in the face of overwhelming independent location evidence, absent evidence of how the interview breaches actually harmed the Clarks. And if the interview breaches did prejudice the Clarks, it was error to altogether foreclose litigation on the navigational warranty when a lesser equitable remedy would have restored them to the positions they occupied absent these relatively minor and immaterial breaches. Finally, it was error to estop the insurers from raising an issue that was not dependent on information learned at the interviews.

We should therefore reverse and remand for further proceedings.